# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Civil Action No. 22 CV 481-KDB-DCK** |
| v. | ) | |
| | ) | **SECOND AMENDED COMPLAINT** |
| TEN OAKS MANAGEMENT, LLC, | ) | |
| ANDREW LOVROVICH, | ) | **JURY TRIAL DEMANDED** |
| DAVID RICHESON, | ) | |
| MATTHEW MAGAN, AND | ) | |
| MICHAEL HAHN. | ) | |
| | ) | |
| *Defendants.* | ) | |

Plaintiff The Boeing Company ("Boeing") alleges the following based upon documents and information in its possession, upon its factual investigation and discovery to date, and upon information and belief where noted below. Boeing believes that substantial additional evidentiary support for its allegations will be obtained in discovery.

## NATURE OF THE ACTION

1. This case is about a scheme by Defendant Ten Oaks Management, LLC ("Ten Oaks"), Ten Oaks' two founders, Defendants Matthew Magan ("Magan") and Michael Hahn ("Hahn"), and two Ten Oaks partners, Defendants Andrew Lovrovich ("Lovrovich") and David Richeson ("Richeson"), to fraudulently induce Boeing to consent to Ten Oaks' acquisition of Astech Engineered Products, Inc. ("Astech"), a supplier of key component parts for Boeing's 767 and 747 aircraft. Defendants executed their scheme by making numerous material misrepresentations—verbally and in writing—to induce Boeing to provide its consent to the assignment of certain key supply contracts between Boeing and Astech. After securing Boeing's consent through fraud, Defendants launched the second part of their scheme. Specifically, just six weeks after acquiring Astech, Defendants presented Boeing with an

1

ultimatum: either submit to an extraordinary price increase (even though those prices had been set in stone by Boeing's contract with Astech), or Ten Oaks would cause Astech to cease production for Boeing. After Boeing refused Defendants' attempted coercion, Defendants caused Astech to seek bankruptcy protection in a naked ploy to gain leverage to obtain the same (or even greater) price increases Defendants' prior coercive attempts had not achieved.

2. Boeing's business relationship with Astech dates back to 2013. In 2013, Boeing and Astech's then-parent company, GKN Aerospace ("GKN"), entered into long-term agreements for the supply of certain highly specialized airplane parts manufactured by Astech (the "Supply Agreements"). Astech manufactures complex, safety critical, honeycomb panel products for use in aerospace, defense and other critical applications. Astech provides engine exhaust kits, fairing assemblies, panel assemblies, and lower flap assemblies. For Boeing, Astech manufactures exhaust kits and sleeve assemblies for the 767 tanker jet, which are used by the United States military. The Supply Agreements set the prices that Boeing would pay Astech for these parts through 2028.

3. In late 2021, GKN sought to sell Astech to Ten Oaks. Ten Oaks is a Charlotte-based "family office" that invests the generational wealth of two families, much like a private equity fund. Ten Oaks invests exclusively in corporate divestitures, and, unbeknownst to Boeing at the time, specializes in acquiring and then disposing of unwanted businesses for other companies.

4. Pursuant to the Supply Agreements, to consummate the proposed transaction, Ten Oaks was required to obtain Boeing's consent to the assignment of the Supply Agreements. Boeing's consent was ultimately secured through a written Consent to Assignment in March 2022 (the "CTA").

5. In determining whether to agree to and execute the CTA, Boeing sought, received, and relied upon material representations by Ten Oaks and its partners. Ten Oaks,

2

Lovrovich, and/or Richeson made representations to Boeing both orally and in writing as part of a scheme planned and directed by Magan and Hahn.

6.     Defendants' material representations to Boeing included promises that Ten Oaks would (a) adequately capitalize Astech immediately upon the closing of the acquisition; (b) make certain critically necessary capital expenditures—for example, equipment repairs and upgrades—to improve the quality and deliverability of the parts supplied to Boeing; (c) secure an approximately $18 million line of credit to ensure Astech's financial and operational viability; (d) tap Ten Oaks' substantial family capital to provide cash directly to Astech as needed to further ensure its financial and operational viability; (e) implement specific measures as part of a detailed operations plan for each of the first 30, 60, and 90 days of Ten Oaks' ownership; (f) minimize customer disruption; and (g) not collect a management fee from Astech. Defendants also made representations regarding the terms of Ten Oaks' acquisition of Astech, representing to Boeing that Ten Oaks "will purchase the assets of the ASTECH business with cash and a short-term seller note" and that there would be $2.5 million in "equity financing" at the close of the transaction. In order to further convince Boeing that Defendants were committed to the business, Defendants represented to Boeing that they generally held companies for at least three to five years. During Boeing's due diligence relating to the CTA, Ten Oaks never raised the prospect of increased pricing, or conditioned any of its representations on Boeing's future agreement to increased pricing. Nor did Ten Oaks ever inform Boeing that the transaction was a "pay-to-take" deal, in which GKN paid nearly approximately $7 million for Ten Oaks to acquire Astech. Ten Oaks also failed to tell Boeing that they intended to hold Astech for only nine to twelve months, and had "no interest" in holding it any longer.

3

7.      Defendants' representations were false. After Ten Oaks acquired Astech in March 2022,[1] Ten Oaks did not adequately capitalize Astech. Ten Oaks did not make capital expenditures to improve the quality and deliverability of the parts Astech manufactured for Boeing or otherwise execute key measures of its promised 30, 60, and 90-day plans. Ten Oaks did not secure a line of credit. Ten Oaks never injected any of its capital to provide cash to Astech, although it did assess a management fee. Ten Oaks did not "purchase" the assets of Astech "with cash," nor was there $2.5 million in "equity financing." Rather than a three- to five-year horizon, Defendants intended to flip Astech within nine to twelve months.

8.      Far from minimizing customer disruption, Defendants executed a post-acquisition strategy that was contrary to the representations Defendants made to Boeing. Astech is the only supplier manufacturing and selling certain "safety critical" parts to Boeing. Accordingly, after acquiring Astech, Defendants' ownership and control over Astech put them in a unique position to cause serious injury to Boeing by limiting or halting Astech's supply of "safety critical" parts to Boeing. This is precisely what Defendants did.

9.      In particular, just six weeks after closing the transaction, Ten Oaks began attempting to exploit Astech's position as the sole supplier of parts critical to the manufacture of Boeing 767 and 747 airplanes. Ten Oaks first caused Astech to demand a price increase of *more than 300%* for the parts Astech supplied. When Boeing refused, Astech, at Ten Oaks' direction, threatened to—and in fact did—stop production and delivery of parts to Boeing.

10.     When Boeing objected to Ten Oaks' bait and switch, Ten Oaks pled ignorance—that it had consummated the Astech transaction without understanding the economics of the Supply Agreements, and claimed that it needed Boeing to acquiesce to extraordinary price increases to preserve for Ten Oaks and its partners a return on their

---

[1] On information and belief, Defendants structured the acquisition as an asset purchase by an entity affiliated with, owned, managed and/or controlled by Ten Oaks. However structured and thereafter organized, Ten Oaks has since managed and/or controlled Astech.

4

investment. That is demonstrably false. Defendants were well aware of the price terms (and all other terms) of the Supply Agreements when Ten Oaks sought Boeing's agreement to the CTA. Defendants had a full opportunity before the acquisition to assess the profitability of Astech's supply agreements with Boeing and other key customers.

11. Defendants were also well aware of Astech's financial condition. Indeed, when Boeing sought financial information about Astech before agreeing to the CTA, Ten Oaks itself supplied Boeing with Astech's financial statements. Astech's financial condition was one of the primary reasons, among other factors, that Boeing pushed Ten Oaks for concrete details on how Ten Oaks would capitalize Astech and improve its operations.

12. At no time before Ten Oaks completed the acquisition, and in none of the dozens of communications between Ten Oaks and Boeing during that period, did Ten Oaks ever raise the prospect of increased pricing. To the contrary, Ten Oaks represented that its financial backing and certain "key operational improvement opportunities" would permit Ten Oaks to "realiz[e] the value of the core ASTECH business." Ten Oaks represented to Boeing that it would "execute its Separation Playbook to create the foundation of value realization in the first 90 days" and the "first Guiding Principle of the separation is to minimize customer disruption."

13. Ten Oaks' move to hold Boeing hostage so soon after closing the Astech acquisition makes clear that one of two things happened: either (1) Lovrovich and Richeson intentionally misrepresented Ten Oaks' post-acquisition strategy and Defendants secretly planned all along to coerce Boeing by stopping production and delivery of key parts to force significant price increases; or (2) Ten Oaks' pre-acquisition due diligence was so knowingly deficient and reckless that Defendants had no reasonable basis for the "value thesis" they represented to Boeing, including the numerous representations Lovrovich and Richeson made to Boeing regarding the post-acquisition steps to which Ten Oaks committed to improve the

5

business from a financial and operational perspective. Defendants thus committed fraud or, at a minimum, made negligent misrepresentations of material fact to Boeing.

14. The misrepresentations Lovrovich and Richeson made were part of a plan with Defendants Magan and Hahn. That plan consisted of agreeing to accept a transfer of Astech from GKN for $1 with the goal of quickly disposing of Astech for profit through liquidation or sale. Meanwhile, Defendants planned to represent to Boeing whatever was necessary to obtain Boeing's consent to the transaction, regardless of the truth of those representations. Magan and Hahn conceived of the fraudulent scheme, agreed with Lovrovich and Richeson to execute the scheme, and were intimately involved in strategizing the actions Defendants took and the statements Defendants made to Boeing, both before and after Boeing's consent. For their part, Lovrovich and Richeson executed the nuts and bolts of this conspiracy. In doing so, Lovrovich and Richeson followed the instructions of Magan and Hahn by making the actual misrepresentations to Boeing.

15. Less than four months after acquiring Astech, Ten Oaks caused Astech to file for bankruptcy protection. Through those proceedings, Ten Oaks has attempted to gain additional leverage in furtherance of its coercion scheme. Indeed, Defendant Richeson admitted during those proceedings that Astech filed for bankruptcy *solely* to gain leverage in order to obtain price increases from Boeing and other customers. In furtherance of their scheme, Defendants caused Astech to obtain a "rejection" of the Supply Agreements—that is, a court order permitting Astech, at Ten Oaks' direction, to renege on and breach the long-term Supply Agreements for which Boeing bargained.

16. The bankruptcy proceedings further demonstrated Ten Oaks' fraud. In testimony under oath in those proceedings, Richeson admitted that Astech and Ten Oaks did not obtain a line of credit. This was directly contrary to Defendants' representations to Boeing. Richeson also admitted that Ten Oaks has injected no cash into Astech—again, contrary to

Defendants' representations to Boeing. Richeson also admitted that Ten Oaks did not "purchase" Astech "with cash," but, instead, the transaction was a "pay-to-take" transaction, in which GKN paid approximately $7 million to induce Ten Oaks to acquire Astech. During the bankruptcy, Ten Oaks also admitted—and sought to collect—management fees from Astech. Further, Ten Oaks never completed its promised investments in repairs, upgrades, or replacements of Astech's machinery, nor did it take the other steps it committed to in order to improve quality or on-time delivery—once again, contrary to Defendants' representations to Boeing.

17. Also in the bankruptcy proceeding, John Esterhay, Astech's former Chief Executive Officer and a former officer in the United States Navy and partner at McKinsey & Company, filed a proof of claim (under penalty of perjury) setting forth in detail numerous specific steps taken by Defendants Magan, Hahn, Lovrovich, and Richeson in furtherance of their fraudulent conspiracy—including terminating Esterhay when he refused to participate in Defendants' lies. Esterhay also filed detailed civil complaints in California state court and North Carolina federal court setting forth the same allegations.[2]

18. Defendants' scheme was intentionally crafted to induce Boeing's reliance, and Defendants knew that Boeing would rely on their representations. In fact, Boeing made abundantly clear to Defendants that Boeing sought those representations for the very purpose of considering the CTA, and that Boeing would rely on them in determining whether to execute the CTA. Boeing would not have agreed to the CTA if Defendants had not committed Ten Oaks to specific plans to address Astech's financial condition and operational challenges, or if Defendants had informed Boeing that Ten Oaks would seek massive price increases.

---

[2] *See* Del. Bankr. Ct. Case No. 22-10635, Claim 13-1; Orange County Superior Court Case No. 30-2022-01279969; 23-cv-00203 (W.D.N.C.).

19. The wrongful conduct by Ten Oaks, Magan, Hahn, Lovrovich, and Richeson—including their conspiracy and fraudulent scheme to induce Boeing to execute the CTA and their post-acquisition attempts to interfere with the contract between Boeing and Astech—presented a grave risk to Boeing's supply chain and caused Boeing significant financial harm.

## PARTIES

20. The Boeing Company is a Delaware corporation and maintains its principal place of business in Arlington, Virginia.

21. Ten Oaks Management, LLC is a Delaware LLC that maintains its principal place of business in Charlotte, North Carolina.

22. David Richeson is a Partner in Ten Oaks and a citizen of North Carolina, and conducts business in North Carolina as a principal agent for Ten Oaks.

23. Andrew Lovrovich is a Partner in Ten Oaks and conducts business in North Carolina as a principal agent for Ten Oaks.

24. Matthew Magan is an owner of Ten Oaks and a citizen of North Carolina, and conducts business in North Carolina as a principal agent for Ten Oaks.

25. Michael Hahn is an owner of Ten Oaks and conducts business in North Carolina as a principal agent for Ten Oaks.

## JURISDICTION AND VENUE

26. The Court has personal jurisdiction over Defendant Ten Oaks because its principal place of business is in Charlotte, North Carolina.

27. The Court has personal jurisdiction over Defendant Magan because he is domiciled in North Carolina and conducts business in North Carolina as a principal agent of Ten Oaks.

28. The Court has personal jurisdiction over Defendant Hahn because he conducts business in North Carolina as a principal agent of Ten Oaks.

29. The Court has personal jurisdiction over Defendant Richeson because he is domiciled in North Carolina and conducts business in North Carolina as a principal agent of Ten Oaks.

30. The Court has personal jurisdiction over Defendant Lovrovich because he conducts business in North Carolina as a principal agent of Ten Oaks.

31. The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the Plaintiff and the Defendants are diverse. Defendant Lovrovich is a resident of Washington, Defendant Hahn is a resident of California, and Defendants Richeson and Magan are residents of North Carolina. Upon information and belief, no member of Ten Oaks is a citizen of the State of Delaware or the Commonwealth of Virginia. Ten Oaks' principal place of business is in North Carolina and the four officers identified in Ten Oaks' Delaware Certificate of Formation—Defendants Magan, Hahn, Lovrovich, and a fourth individual, Curtis Griner—are citizens of North Carolina, California, Washington and North Carolina, respectively.

32. Venue is proper under 28 U.S.C. § 1391(b)(3) because all Defendants are subject to the Court's personal jurisdiction.

## BACKGROUND

33. Ten Oaks is a "family office" founded in 2017 to invest the generational wealth of its founders, Magan and Hahn. Ten Oaks invests exclusively in corporate divestitures and purports to specialize in quick-turnaround acquisitions of companies it perceives as undervalued and with significant growth potential. Ten Oaks intentionally styles itself as a "family office," rather than a private equity firm, because that term is more appealing to employees and other audiences, including potential business partners. The vagueness inherent to a "family office" allows Ten Oaks flexibility when communicating tailored narratives depending on the audience and depending on which version of Ten Oaks it wants to portray.

Indeed, before Boeing agreed to the CTA, Ten Oaks portrayed itself as a company focused on turnarounds. Ten Oaks never disclosed to Boeing that it intended to quickly liquidate or sell the company, and that as a result, it conducted little to no due diligence on Astech.

34. Astech manufactures airplane parts, including a specialized exhaust nozzle and plug with a unique honeycomb weld for engines for the Boeing 767 tanker and the Boeing 747. The Boeing 767 tanker is a refuelling and transport aircraft used by, among other customers, the United States military. In addition, Boeing obtains the 747 exhaust nozzle and plug through a contract with Spirit Aerospace, who in turn contracts with Astech to supply that part. No other supplier manufactures the same honeycomb weld exhaust.

35. In 2013, Boeing entered into the Supply Agreements with GKN for the supply of the 767 exhaust nozzle and plug. The Supply Agreements include established pricing terms for Astech's parts sold to Boeing through 2028.

36. In late 2021, GKN began looking for a buyer for Astech.

37. GKN ultimately found a willing partner in Ten Oaks. In December 2021, Ten Oaks agreed to purchase Astech from GKN through an asset sale, subject to certain conditions. Those conditions included the assignment of supply agreements between Astech and its key customers, including Boeing. Boeing later learned that the nearly $7 million in cash on Astech's balance sheet that Ten Oaks acquired came from a payment made by GKN. Defendants structured and characterized that payment as a pre-closing working capital contribution, but it was actually Ten Oaks' fee to assume the risk of acquiring Astech.

38. In or around December 2021, GKN advised Boeing of the intended sale to Ten Oaks. Under the terms of the Supply Agreements, Boeing had the right to consent—or not— to any proposed assignment of the Supply Agreements. Boeing was thus asked for its consent to assign the Supply Agreements. If Boeing consented, the Supply Agreements would be assigned to a holding company created solely for the transaction. On December 22, 2021, GKN

10

advised Boeing that Defendants Magan and Lovrovich would be Boeing's points of contact for any questions regarding the acquisition.

39. To ensure the supply continuity of the parts for the aircraft it manufactures, and to avoid disruptions to its production system resulting from assignments of supply contracts, Boeing has established a process for evaluating requests for consent to assign critical supply contracts. Here—particularly given the importance of the Supply Agreements to Boeing's ability to manufacture and supply aircraft for military uses—Boeing followed its established consent to assignment evaluation process.

40. As the first step in its evaluation process, Boeing engaged its enterprise credit risk department to evaluate Astech's financial viability, based on the express representations Ten Oaks had made to capitalize and financially support Astech. Boeing advised Defendants that it sought information and specific representations about Ten Oaks' financial and operational commitments for the express purpose of determining whether to execute the CTA.

41. Boeing first solicited from Ten Oaks a series of written explanations, including the following:

- Please provide a diagram illustrating the pre- and post-transaction legal corporate structure (please include ownership percentages for each relationship)

- What is the strategy behind the acquisition?

- If there is a parent company, how will cash be managed between the parent and subsidiary? Please describe the treasury management relationship in detail.

- Will the company or assets acquired become a subsidiary, division, or stand-alone entity?

- Will there be any changes to the operations of the Company?

- Will there be any management fees assessed?

- How will the stock or assets be purchased (debt, cash, stock, etc.)?

11

- How will the stock or assets be purchased (debt, cash, stock, etc.)? Will these instruments all be recorded on the balance sheet of the new or impacted entities? If no, please describe where these items will be recorded?

- Please describe any funding sources that will be available to the entity after the acquisition closes (i.e. cash, credit facility, commercial paper, etc.). If a credit facility will be available please list the amount authorized to borrow, amount available to borrow, and amount outstanding. Also, please provide the borrowing base calculation, if applicable, along with a description of any terms that restrict borrowing ability.

42. Boeing also required that Ten Oaks provide pro forma forecasted financial statements for Astech, including an opening balance sheet, a detailed description of any planned facility moves or material equipment purchases, a schedule of depreciation and amortization for the next two years, a detailed description of any planned organizational restructuring, financial statements for the parent company, an equity ownership schedule, and a certificate of ownership and merger.

43. On or about December 31, 2021, Ten Oaks provided its initial responses to Boeing's questions—in an e-mail with attachments on which Defendants Lovrovich and Magan were copied. In response to the question "Will there be any management fees assessed?" Ten Oaks stated "Currently, management fees are not contemplated for ASTECH Engineered Products; any fees paid would be related to pass through costs."

44. On or about December 31, 2021, in that same written communication, in response to the question "How will the stock or assets be purchased (debt, cash, stock, etc.)?" Ten Oaks stated "Buyer will purchase the assets of the ASTECH business with cash and a short-term seller note…" Ten Oaks also represented that there would be $2.5 million in "equity financing," in other words, a $2.5 million investment by equity holders—Defendants Magan and Hahn.

45. On or about December 31, 2021, in that same written communication, in response to the question "Will there be any changes to the operations of the company?" Ten Oaks stated that "Ten Oaks plans to operate the ASTECH Division in the usual and ordinary

12

course of business"—with no reference to increased customer pricing, or threats to shut down production and shipments if Boeing did not agree to increased pricing.

46. On or about December 31, 2021, Ten Oaks provided the requested pro forma financial statements, which, as with Ten Oaks' representation that it would run Astech in the "usual and ordinary course of business," among its various other representations, contained no reference to increased customer pricing.

47. On or about February 9, 2022, in a follow-up e-mail, on which Defendants Magan and Lovrovich were again copied, Ten Oaks represented that Astech would open with a post-acquisition cash balance of approximately $5 million. In reliance on this representation by Ten Oaks and Astech's historical financial performance, Boeing reasonably concluded that an opening $5 million cash balance would allow Astech to operate and perform under the Supply Agreements for at least one year. One year is far longer than the six weeks Astech operated post-acquisition before its price increase demands began. Ten Oaks' additional representations regarding operational improvements—including specific, written 30, 60, and 90-day execution initiatives—also led Boeing to reasonably conclude that an opening $5 million cash balance would give Ten Oaks enough time to implement additional financial and operational improvements that would significantly extend Astech's ability to operate and honor the Supply Agreements in the long term.

48. Providing further assurances to Boeing, on or about December 31, 2021, in the same communication referenced above, Ten Oaks represented to Boeing in writing that "Ten Oaks does not currently have a credit facility in place for ASTECH Engineered Products, Inc., *but will seek to after close with one of Ten Oaks['] preferred lending partners*." In the later e-mail on February 9, 2022 (referenced above), Ten Oaks stated it intended to seek a line of credit of approximately $18 million. Based on this representation, Boeing reasonably concluded that Astech's operational runway would be extended for several additional years. Boeing also

13

reasonably concluded that Ten Oaks' commitment to seek a credit facility would give Ten Oaks further opportunity to implement its promised improvements at Astech—further ensuring Astech's long-term ability to perform under the Supply Agreements.

49. In addition to the questions set forth above, Boeing contacted Ten Oaks with additional information requests. For example, Boeing asked Ten Oaks to explain in more detail what it saw in Astech that made the transaction appealing, and sought confirmation of whether the pro forma financial statements Ten Oaks had provided for Astech accounted for Astech's current financial condition.

50. On or about January 19, 2022, Ten Oaks confirmed in writing that the pro forma financial statements did account for Astech's current financial condition, and confirmed again that Ten Oaks would secure a line of credit for Astech.

51. Boeing asked for more detail on the line of credit and Ten Oaks' plans to invest in Astech, including the following written questions:

- How much would the line of credit be?

- Were there additional lines of funding available to Astech?

- Would Ten Oaks be willing to inject cash if necessary?

52. In response, on or about February 9, 2022 (in the e-mail discussed above), Ten Oaks represented in writing that "Astech will start with a cash balance of ~ $5M, then will seek to add a line of credit, and lastly has access to Ten Oaks' meaningful family office equity capital available for further investment." As noted above, Ten Oaks provided specific details on its commitments to utilize an asset-based lending facility to secure a line of credit of up to approximately $18 million. Ten Oaks also specifically confirmed in writing (yet again) that, if needed, it would inject additional cash into Astech, and gave an example of a recent equity injection into another portfolio company to fund working capital needs and future growth,

14

leading Boeing to reasonably believe that Ten Oaks would, and had the capacity to, similarly fund Astech if necessary to ensure its financial and operational viability.

53.     Ten Oaks' responses to Boeing's written diligence questions were directed by Ten Oaks' owners, Magan and Hahn, and with advice from other key personnel associated with Ten Oaks. Magan and Hahn developed the overall strategy for the Astech acquisition and the specific plans to fraudulently obtain Boeing's consent, and directed other Ten Oaks personnel, including Lovrovich and Richeson, as to the specific statements they should make to obtain Boeing's consent—even when they knew those statements were not true. All four individual Defendants—Magan, Hahn, Lovrovich and Richeson—agreed to execute the fraudulent scheme, in order to induce Boeing to consent to the CTA.

54.     Following its initial written diligence, Boeing conducted additional diligence in its consideration of the CTA. Boeing also requested an in-person meeting and asked Ten Oaks to present its mission, its vision for Astech, and additional details about its promised improvements to Astech's financial conditions and operations. At bottom, Boeing sought to confirm Ten Oaks' commitment to the business and its specific plan to run Astech profitably.

55.     Leading up to the February 10, 2022 meeting, Defendant Hahn e-mailed GKN stating that Ten Oaks needed to finalize their negotiations of the "cash amount" (the approximately $7 million GKN paid Ten Oaks, which Ten Oaks never disclosed to Boeing) as this would influence what Ten Oaks would (or would not) say to Boeing regarding potential price increases and/or a deposit by Boeing, either during or after the February 10, 2022 meeting. Ultimately, as set forth below, prior to Boeing's execution of the CTA, Ten Oaks never disclosed to Boeing that it would demand price increases post-acquisition.

56.     Ten Oaks and Boeing met in person at Boeing's offices in Everett, Washington, on February 10, 2022. Richeson and Lovrovich both attended the meeting. Ten Oaks portrayed Richeson as an experienced operations executive with "25+ years of executive management

15

experience" in the automotive manufacturing industry, which—Ten Oaks stressed—like aerospace, runs twenty-four hours a day, seven days a week. Ten Oaks also portrayed Richeson as a "certified turnaround professional" who would oversee Astech on a daily basis.

57.     At the February 10 meeting, using a slide deck prepared by Lovrovich and, upon information and belief, approved by Hahn and Magan, Lovrovich and Richeson described Ten Oaks' manufacturing experience, touted its recent successful transactions, and offered their "Astech Value Thesis." In articulating their thesis, Lovrovich and Richeson described their purported view that Astech had a "strong core value prop that is undervalued by the current owner." Lovrovich and Richeson represented that their "[i]mprovement hypothesis is straight-forward given the under-investment and under-management of the business unit." Lovrovich and Richeson further represented that "Ten Oaks brings resources to bear that will be additive to its existing customer value proposition through improvement of its operations and service levels." According to Lovrovich and Richeson, Ten Oaks would "leverage its wide network to bring additional industry and functional expertise" to Astech. Ten Oaks stated that the "Guiding Principle of the separation [i.e., Ten Oaks' acquisition of Astech from GKN] is to *minimize customer disruption*." (emphasis added).

58.     Lovrovich and Richeson also highlighted certain aspects of prior acquisitions that they knew—based on Boeing's prior focused inquiries—would be material to Boeing. For example, in discussing Ten Oaks' acquisition of Company A, Lovrovich and Richeson trumpeted Ten Oaks' "capex investments to streamline operations, improving efficiency, quality, and cost," noting that "[c]ustomer feedback has been exceptionally positive to date with transaction." In discussing Ten Oaks' acquisition of Company B, Lovrovich and Richeson stressed that "[p]ost-close all customer contracts remain intact" and that "[m]ajor operation issues causing unsustainable cash burn in the prior ownership structure were identified and

16

solved for in the first year" through "strategic investments in equipment and technology to further improve customer experience and control cost."

59.     Analogizing the proposed Astech acquisition to those purported past successes, in the same presentation, Lovrovich and Richeson presented specific commitments for Astech's operation, including an overarching "Transformation Plan," a specific "Operational Improvement Plan," and capex improvement steps, which included key equipment upgrades to improve the quality of Astech's parts. Lovrovich and Richeson represented that Ten Oaks generally held acquired companies for at least three to five years.

60.     Lovrovich and Richeson represented that Ten Oaks would "identify gaps in [Astech's] management team and…use Ten Oaks in-house executive recruiter partner to fill identified gaps within [the] first 90-180 days."

61.     Lovrovich and Richeson specifically promised that Ten Oaks would invest in the following key equipment upgrades: a panel fabrication machine control system upgrade, which would address a pitting defect in the 767 exhaust panels; a strand annealer upgrade and replacement, intended to mitigate single point of failure risk in the fabrication process; and a senzimir maintenance overhaul and control system upgrade, which needed to be upgraded to modern technology. Through these steps and others, Lovrovich and Richeson represented that Ten Oaks would cause Astech to "[d]eliver perfect parts on time," by "improv[ing] on time delivery and minimiz[ing] waste" and "reduc[ing] defects and rework."

62.     Lovrovich and Richeson also represented that Ten Oaks would cause Astech to implement short term 30, 60, and 90-day execution steps, with a detailed list of specific operational improvements that Lovrovich and Richeson represented would minimize customer disruption—that is, disruptions to Boeing's production system. During the first 90 days post-closing, Lovrovich and Richeson stated that Ten Oaks would identify key employees and

17

institute retention packages to ensure continuity, fill leadership and personnel gaps, conduct a leadership summit to develop a strategic plan, and create detailed budgets for 2022.

63. During the February 10 meeting, Boeing specifically asked Lovrovich and Richeson whether Ten Oaks had the necessary knowledge to run an aerospace manufacturing facility given its lack of experience in the industry. Lovrovich and Richeson responded that this was precisely the reason that Richeson would be responsible for operations—because he had significant manufacturing experience in the automotive industry, which Lovrovich and Richeson portrayed as comparable to Astech's industry.

64. At no point during the February 10 meeting or at any other time before Boeing's consent to the assignment did Defendants state they intended to demand price increases under Astech's Supply Agreements. Nor did Defendants disclose that the primary post-acquisition strategy they would actually implement would be to demand that Boeing and other key customers shoulder significant price increases under threat of ceasing production and shipment. Defendants also never disclosed that they intended to own Astech for only nine to twelve months.

65. Once again, at each step in the process to fraudulently obtain Boeing's consent, Magan and Hahn were intimately involved in overseeing the acquisition strategy and directing the misrepresentations that were made to Boeing. The misrepresentations that Lovrovich and Richeson made at the February 10 meeting, and the misrepresentations contained in the accompanying presentation, were part of the plan created and overseen by Magan and Hahn, and were made at their direction.

66. Ultimately, Boeing reasonably and justifiably relied on Defendants' representations, which induced Boeing to agree to the CTA on March 3, 2022.

67. Shortly thereafter, Ten Oaks closed on the Astech acquisition with GKN. Ten Oaks acquired Astech for just one dollar and obtained nearly $7 million in cash through its

18

acquisition of Astech's assets. The net effect of the transaction was that, rather than the buyer paying the seller to acquire a business, the seller effectively paid the buyer to assume the seller's responsibility for the business. This is commonly known as a "pay-to-take" transaction. Indeed, Richeson later admitted in the bankruptcy proceedings that Ten Oaks' Astech acquisition was, in fact, a pay-to-take transaction.

68. Defendants disclosed nothing about the terms of the pay-to-take sale when Ten Oaks sought Boeing's consent to assign the Supply Agreements. Had Boeing understood that Ten Oaks was willing to acquire Astech only if it first obtained a $7 million cash contribution from its previous owner, that key information would have both cast greater light on Ten Oaks' view of the full the extent of Astech's financial and operational challenges, and it would have contradicted Ten Oaks' representations about Astech's value proposition. Because Defendants knew that a pay-to-take transaction would threaten Boeing's willingness to consent, they intentionally concealed it. And even after obtaining Boeing's consent, Defendants actively worked to conceal from Boeing that the Astech acquisition was a pay-to-take transaction.

69. Defendants also intentionally structured the transaction with multiple entities and layers of ownership and control between Hahn and Magan and Astech specifically to shield the owners from any risk associated with the transaction. For the same reason, Hahn and Magan keep Ten Oaks' cash in their personal bank accounts—rather than in Ten Oaks' operating bank accounts—to shield Ten Oaks from judgment in the event of litigation. Hahn and Magan also regularly add key legal personnel to routine emails discussing business decisions—and not seeking legal advice—in anticipation of attempting to use the attorney-client privilege to shield their discussions from disclosure. Hahn and Magan specifically and intentionally attempted to obscure their individual roles in Astech in order to escape any responsibility for the conspiracy to fraudulently induce Boeing's consent that they masterminded.

19

70. Boeing soon learned that, as part of Ten Oaks' strategy, Defendants had made numerous material misrepresentations and omissions to Boeing prior to it signing the CTA. Had Defendants not made those material misrepresentations and omissions, Boeing would not have agreed to the CTA.

71. On or about May 12, 2022, just six weeks after Boeing gave its consent to the assignment of the Supply Agreements—a material prerequisite to Ten Oaks' acquisition of Astech—Ten Oaks directed Astech to send Boeing a ransom note demanding that Boeing agree to immediately begin paying *more than three times* the contractual prices for the parts Astech supplied. If Boeing did not agree to that drastic and baseless demand, Defendants caused Astech to threaten to stop production of parts critical to Boeing's production of airplanes.

72. At this point, Ten Oaks had not caused Astech to make any of the promised machinery upgrades or any other operational improvements, had not obtained a line of credit, and had not injected any cash into the company. As Boeing later learned, Ten Oaks did conduct an appraisal of Astech's equipment, but refused to use that appraisal to obtain an asset-based loan, likely because Ten Oaks did not want any other creditors to have a claim on Astech's assets if and when Ten Oaks decided to liquidate the company. According to Esterhay, Defendant Richeson specifically told Esterhay that he did not want Astech to apply for any financing because Defendants did not want any lender to have a lien on Astech's fixed assets.[3]

73. Esterhay, Astech's former CEO for a short time, sought to make improvements to Astech—including restructuring management roles, obtaining financing, reducing scrap, and improving equipment and maintenance—but Lovrovich and Richeson thwarted him at every turn, telling him to make no changes without their approval. That approval, in turn, came from Defendants Hahn and Magan. Defendant Hahn in particular was closely involved in the day-to-day operation of Astech, though he obscured his role by insulating himself from Esterhay

---

[3] 23-cv-00203, Docket Entry 23 ¶ 91 (W.D.N.C.).

20

and other Astech personnel. Hahn participated in weekly meetings with Defendants Lovrovich and Richeson ahead of Lovrovich and Richeson's own weekly meetings with Astech personnel, which allowed Hahn to make decisions that Lovrovich and Richeson would then execute.

74. Boeing requested an in-person meeting to discuss Ten Oaks' inappropriate pricing demand and interference with the Supply Agreements. Ahead of that meeting, Ten Oaks called an internal meeting to discuss what would be said to Boeing, with Richeson, Lovrovich, and others eventually agreeing to withhold shipping of any product to Boeing until the meeting took place.

75. Defendants Lovrovich and Richeson met with Boeing on behalf of Ten Oaks on May 25, 2022. At that meeting, Boeing reiterated the incontrovertible fact that the Supply Agreements—of which Ten Oaks was fully aware before the acquisition—established parts prices through 2028. Lovrovich not only confirmed as much, but doubled down, confirming Defendants' prior representations about Astech's capitalization and operational improvements made at the February 10 meeting, and claiming again that Ten Oaks would follow through on these commitments.

76. Lovrovich also claimed that Ten Oaks *had invested* and *would continue to invest in Astech*—even though it had made no investment so far and had no intention of doing so (and never did)—and that Ten Oaks had no plans to sell Astech or liquidate the company—even though Ten Oaks refused to allow Astech to obtain a loan to avoid a lien in the event of liquidation and would cause Astech to file for bankruptcy protection within weeks of this meeting.

77. At the May 25 meeting, Lovrovich also represented to Boeing that Ten Oaks had no plans to sell Astech—despite the fact that Ten Oaks intended all along to hold Astech for only a short period, specifically nine to twelve months, before either selling it to a new buyer or liquidating the company. Indeed, Richeson, who acted as Astech's Executive

21

Chairman, held a 5% ownership stake in Astech, and thus stood to profit handsomely if the company was sold and the proceeds distributed to equity holders.

78. Lovrovich also told Boeing at the same meeting that Ten Oaks was not drawing a fee to manage Astech. This, too, was false. Ten Oaks' management agreement with Astech provides for a $350,000 annual management fee and permits that fee to be recouped later in time, which is precisely what Defendants did. In the Astech bankruptcy proceedings, Defendants filed a proof of claim seeking payment of management fees purportedly owed to Ten Oaks. Defendants have also admitted in interrogatory responses in this case that Ten Oaks assessed Astech a management fee.

79. The May 25 misrepresentations, like those made to fraudulently induce Boeing's consent, were made by Lovrovich and Richeson to conceal the scheme developed and directed by Magan and Hahn. The lies told during the May 25 meeting make clear Defendants' intent and evidence a consciousness of guilt. Esterhay also attended the May 25 meeting and was alarmed by Defendants' blatant misrepresentations to Boeing. When Esterhay refused to echo Defendants' misrepresentations or participate in their scheme to defraud Boeing at the May 25 meeting, Ten Oaks terminated him two days later. All of this was done in the furtherance of concealing Defendants' fraudulent scheme.

80. At the May 25 meeting, Boeing made clear that it would not be held hostage, but offered that Boeing would be willing to revisit a potential price increase—though nowhere near Defendants' extortionate demands—on the condition that Astech resume on-time delivery and sustain that performance for at least three consecutive months. Lovrovich represented that Astech would resume deliveries.

81. That was another lie. Less than three weeks after the May 25 meeting, Ten Oaks again reneged. On June 10, 2022, Richeson sent a letter to Boeing and Astech's other customers demanding another meeting to discuss "financial relief." In that letter, Richeson specifically

22

stated that "this meeting will not be about rights and obligations that your company has under its supply contracts with ASTECH"—a clear acknowledgement that the Supply Agreements Ten Oaks assumed already established binding prices. For the first time, Richeson also asserted that Astech's business model was somehow "unsustainable."

82. Boeing sent representatives to Ten Oaks' demanded meeting on June 20, 2022, in Detroit. At that meeting, it quickly became clear that Ten Oaks was not prepared to discuss its promised capital investments or operational improvements. Instead, Ten Oaks defaulted back to its demand that Boeing and Astech's other key customers agree to extraordinary price increases, making clear this was Ten Oaks' intention all along—even before Boeing agreed to the CTA. In inducing Boeing to execute the CTA, Defendants had *never once* disclosed or even suggested that changes to parts pricing would be desirable or necessary to Astech's ability to perform under the Supply Agreements. Indeed, Richeson confirmed in sworn testimony that, while Ten Oaks was seeking to persuade Boeing to agree to the CTA, Ten Oaks never disclosed that it intended to demand increased pricing from Boeing after the acquisition closed.

83. On July 15, 2022—less than four months after Ten Oaks acquired Astech—Ten Oaks caused Astech to declare bankruptcy.

84. On August 17, 2022, Defendants caused Astech to file a motion in the bankruptcy proceeding seeking a court order that would allow Ten Oaks to reject the Supply Agreements. Notably, Astech did not file a motion to reject any of its contracts with other key customers. On September 7, 2022, the bankruptcy court granted Astech's motion authorizing the rejection of the Supply Agreements, which automatically and by operation of law (pursuant to Section 365(g) of the Bankruptcy Code) constituted a breach of the Supply Agreements as of July 15, 2022.

85. The bankruptcy proceedings have revealed further evidence of Defendants' fraud. For example, Richeson testified under oath that Ten Oaks had not obtained any asset-

based loan or other source of cash for Astech—contrary to Defendants' express representation to Boeing that Ten Oaks would obtain an approximately $18 million line of credit. Richeson also testified that Ten Oaks provided no cash to Astech—once again, plainly contrary to Defendants' express representations in February 2022 that Astech would have "access to Ten Oaks [sic] meaningful family office equity capital [] for further investment" in Astech, Ten Oaks would "inject additional cash into Astech to bridge any liquidity needs," and Ten Oaks would make such "incremental equity investment[s]" to realize the "upside opportunity [Ten Oaks] see[s] with the business" (along with Lovrovich's May 2022 representation that Ten Oaks *had contributed* capital to Astech). Richeson also confirmed in testimony under oath that Lovrovich and Ten Oaks' General Counsel caused Astech to file for bankruptcy.

86. Esterhay's proof of claim in the bankruptcy proceedings and his civil complaints in California and North Carolina allege that Ten Oaks, Lovrovich, Richeson, Hahn, and others defrauded Boeing. Esterhay's complaint alleges, among other things, that: (1) Ten Oaks disguised the terms of the Astech acquisition to hide Ten Oaks' fee to acquire the company; (2) Ten Oaks falsely represented to Boeing that it would contribute capital to Astech and that, as of May 2022, Ten Oaks had in fact contributed capital to Astech, which it had not; and (3) Ten Oaks falsely represented to Boeing that it would secure a line of credit and that, as of May 2022, Ten Oaks was actively seeking a line of credit, which, again, it was not. According to Esterhay, Defendant Richeson specifically told Esterhay that he did not want Astech to apply for any financing because Defendants did not want any lender to have a lien on Astech's fixed assets.[4] According to Esterhay, Defendant Richeson told Esterhay "that Ten Oaks desired to hold ASTECH for as short a time as possible…[and] expect[ed] to hold it in the range of 9-12 months and had 'no interest' in holding ASTECH for longer."[5] Similarly, according to

---

[4] *Id.* at ¶ 91.

[5] *Id.* at ¶ 158.

Esterhay, Defendant Lovrovich told Esterhay that "several of Ten Oaks's portfolio companies had been quick flips and that Ten Oaks did not keep portfolios for longer holding periods, because they sought to complete separation activities and resell within 18-24 months."[6] Further, according to Esterhay, on March 16, 2022, Defendant Hahn specifically told him that Ten Oaks had not invested any of its own money to acquire Astech and, further, that Ten Oaks *would not* invest any of its own money in Astech[7]—despite the representations to Boeing.

87. Esterhay likewise alleges that Magan and Hahn, as Ten Oaks' owners, orchestrated this entire scheme behind the scenes.

88. Further, although before the acquisition Ten Oaks presented Richeson as a "certified *turnaround* specialist" with extensive experience in implementing financial and operational improvements, in bankruptcy filings Ten Oaks revealed that Richeson was, in fact, an "experienced *restructuring* officer." That is consistent with Ten Oaks' true, concealed intention all along: to force price increases through bankruptcy if it could not do so through its wrongful threats to stop production and shipping. Ten Oaks' effort to obscure Richeson's restructuring expertise provides further evidence of its intent to deceive.

89. Richeson also testified under oath that Ten Oaks' management team performed most of its diligence work on Astech *after closing*. Indeed, in the bankruptcy proceedings, Ten Oaks claimed that after the acquisition, it "really dug into the business" and supposedly came to the conclusion that "the business had, over time, but particularly now, become significantly unprofitable."

90. Astech's contracts were in place and the economic impact of those contracts was known or knowable to Ten Oaks well before the acquisition. Ten Oaks had every opportunity to "really [dig] into" Astech's contracts *before* acquiring the company. Indeed, as

---

[6] *Id.* at ¶ 157.

[7] *Id.* at ¶ 59.

Richeson himself explained to the bankruptcy court, Astech has only four key customers. Ten Oaks actually did assess, or could easily have assessed, the handful of contracts Astech had with its key customers before seeking Boeing's consent to assign the Supply Agreements and closing the acquisition. Either Defendants intentionally misrepresented Ten Oaks' strategy for operating Astech post-acquisition or they negligently or recklessly failed to conduct even cursory diligence before making material specific representations to Boeing. Indeed, in his proof of claim filed in Astech's bankruptcy proceedings and in his civil complaint, Esterhay alleged that Defendants intentionally made materially false statements to Boeing.

91. Richeson also admitted under oath to the threats made to Boeing, acknowledging that Astech stopped shipping product to customers (including Boeing) in an effort to force those customers to agree to substantial price increases.

92. Magan and Hahn were each involved in the decision to cause Astech to file for bankruptcy and to move to reject Boeing's contracts. Upon information and belief, Magan and Hahn developed and directed the pricing demands made by Richeson.

93. In addition to the various false statements and acts of concealment set forth above, to-date, Ten Oaks never made the capital investments in Astech that it represented it would, including, but not limited to, the critical equipment repairs, upgrades, and replacements Ten Oaks represented it would make during the February 10 meeting. Ten Oaks also never took any steps to address certain personnel gaps at Astech—including, for example, Astech's Director of Engineering position—despite its representation it would do so during the same meeting.

94. Once again, these failures are the result of Defendants' intentional scheme, planned and overseen by Magan and Hahn, and carried out by Lovrovich and Richeson.

95. Based on Defendants' knowledge that Boeing's repeated and detailed questions about Ten Oaks' post-acquisition capitalization of and future investment in Astech were made

26

in connection with Boeing's consideration of the CTA, Defendants unquestionably knew and intended that Boeing would rely on Defendants' representations to determine whether or not to consent to the assignment of the Supply Agreements.

96. Likewise, Defendants knew their representations regarding their future plans for Astech, including, but not limited to, their representations regarding operating Astech in the ordinary course (without price increases) and without customer disruption (threats to stop production and shipments of product), their anticipated holding period and their intent to not collect a management fee, were material to Boeing's agreement to the CTA. Further, Defendants knew that their representations regarding the transaction terms, securing a line of credit, capital infusions from Ten Oaks, and specific equipment upgrades to improve the quality of parts Boeing received, were material to Boeing's agreement to the CTA.

97. Defendants also knew that Richeson's manufacturing experience in a high-pressure industry was material to Boeing's agreement to the CTA, as were Defendants' promises that Ten Oaks would address personnel gaps at Astech within the first 90 days of the acquisition.

98. At no point did Defendants offer any caveats or conditions for their promises. Defendants' representations were never based on post-closing diligence, price increases, or any other condition.

99. Defendants never implemented *any* of their specific, definite, and material commitments to Boeing. Defendants' conduct and dramatic change in direction immediately after the acquisition closed makes clear that they knew at the time they made those representations that they would not follow through on those commitments. Instead, Ten Oaks intended all along to acquire Astech, make no investments or improvements, and use Astech's status as a sole-source supplier to force Boeing to accept pricing concessions under threat of

27

withholding the delivery of products that are vital to Boeing's ability to supply commercial and military aircraft.

**COUNT I: FRAUDULENT MISREPRESENTATION**
**Against Ten Oaks, Lovrovich and Richeson**

100. Boeing realleges each and every allegation contained in paragraphs 1-99 above as if fully set forth herein.

101. As described above, Ten Oaks, Lovrovich and Richeson each made numerous false representations and omissions to Boeing, including that Ten Oaks would obtain a line of credit for Astech, would inject capital into Astech, would make specific upgrades to machinery as part of capex improvement, would take specific steps to improve operations, and would execute specific 30, 60, and 90-day initiatives after the acquisition closed.

102. Even after Boeing agreed to the CTA, Ten Oaks, Lovrovich and Richeson continued their misrepresentations—including claiming at the May 25 meeting that Ten Oaks had and would continue to invest in Astech—to perpetuate their scheme.

103. These representations were false, and Ten Oaks, Lovrovich and Richeson knew them to be false at the time they were made. Defendants' failure to take any of the promised actions, including, but not limited to, those promised within 30, 60, or 90 days of the acquisition, demonstrates that their misrepresentations were intentional.

104. Ten Oaks, Lovrovich and Richeson also failed to disclose that they intended to attempt to force Boeing to agree to extraordinary price increases—even though the contract Ten Oaks assumed established prices for at least the next six years—within mere weeks of closing the acquisition, under threat of stopping production or delivery of safety critical parts that Defendants knew Boeing could not obtain from any other supplier.

105. Ten Oaks began threatening Boeing with a production and delivery stoppage within weeks of the acquisition, and before the time for Ten Oaks' claimed 30, 60, and 90-day execution steps had even run. This abrupt departure from Defendants' promised execution

28

strategy further demonstrates that Defendants' plan all along was to force a renegotiation of the Supply Agreements, not to implement the various operational improvements and capitalization Defendants had represented to Boeing that Ten Oaks would execute.

106. That Ten Oaks forced Astech into bankruptcy almost immediately after the acquisition—less than four months afterward—likewise demonstrates that Defendants knew before Boeing executed the CTA that Ten Oaks never intended to actually execute, or even attempt to execute, on all of the initiatives that Defendants promised to Boeing. On September 7, 2022, the bankruptcy court granted Astech's motion to reject the Supply Agreements, resulting in breach of the Supply Agreements.

107. Boeing reasonably and justifiably relied on Defendants' representations when it agreed to the CTA, and Defendants knew and intended that Boeing would rely on their representations in deciding whether to execute the CTA. Defendants made their false and misleading statements to induce Boeing to execute the CTA.

108. Boeing has been injured by Defendants' false and misleading statements. Rather than make the investments and take the other specific steps Ten Oaks promised to ensure Astech's financial viability, Ten Oaks caused Astech to disaffirm continuing performance obligations to Boeing. As a result, to obtain the safety critical parts supplied only by Astech for certain of the military aircraft it manufactures, Boeing has been forced to pay materially higher prices than those for which it contracted. Astech's non-performance threatened to leave Boeing without a source of supply for safety critical components for the 767 aircraft, resulting in a loss of revenue, a threat to continued production of military aircraft, and costs incurred to identify and contract with an alternative supply source.

109. Boeing seeks damages, including, but not limited to, Boeing's costs to secure the parts Astech was obligated to manufacture under the Supply Agreements, including, but

29

not limited to, cover damages, design costs and costs incurred to transition to an alternative supplier, among other damages, along with any lost profits.

**COUNT II: NEGLIGENT MISREPRESENTATION**
**(In the Alternative to Count I)**
**Against Ten Oaks, Lovrovich and Richeson**

110. Boeing realleges each and every allegation contained in paragraphs 1-109 above as if fully set forth herein.

111. Ten Oaks, Lovrovich, and Richeson owed Boeing a duty of care in making representations about financial and operational improvements for Astech because they knew that Boeing would rely on those representations to enter into the CTA. Boeing's entire *purpose* in soliciting information and commitments from Defendants about the financial and operational improvements they would make was to determine whether to execute the CTA. Defendants knew that this was the purpose for Boeing's solicitations. Defendants knew that Boeing would rely on the responsive information and commitments that Defendants provided. And, accordingly, Defendants' purpose for providing such information and commitments was to induce Boeing's consent.

112. As described above, Ten Oaks, Lovrovich, and Richeson each made numerous false representations and omissions to Boeing in breach of their duty of care, including that Ten Oaks would obtain a line of credit for Astech, would inject capital into Astech, would make specific improvements to machinery, and would implement specific operational improvements, alongside initial 30, 60, and 90-day execution steps.

113. Boeing reasonably and justifiably relied on Defendants' representations when it agreed to the CTA, and Defendants knew that Boeing would rely on their representations in deciding whether to execute the CTA. Ten Oaks, Lovrovich, and Richeson made their false statements and omissions to induce Boeing to execute the CTA.

30

114. If Defendants' false statements and omissions were not intentionally made, they were recklessly made, without regard to whether they were true. Ten Oaks, Lovrovich, and Richeson had no reasonable basis for their representations, because they did not conduct sufficient due diligence on Astech or the Supply Agreements. Defendant Richeson admitted as much, testifying under oath that he and Ten Oaks had not analyzed the company's profitability until *after* Defendants made their representations to Boeing. Defendants knew or should have known of the Supply Agreements' provisions—including Astech's pricing and performance obligations thereunder—before Defendants made their representations to Boeing.

115. As a result of Defendants' negligent misrepresentations, Boeing has been injured. Boeing seeks damages, including, but not limited to, Boeing's costs to secure the parts Astech was obligated to manufacture under the Supply Agreements, including, but not limited to, cover damages, design costs and costs incurred to transition to an alternative supplier, among other damages, along with any lost profits.

## COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT
### Against All Defendants

116. Boeing realleges each and every allegation contained in paragraphs 1-115 above as if fully set forth herein.

117. Boeing had valid contracts for the manufacture and supply by Astech of exhaust nozzles and plugs for use in the Boeing 767 tanker.

118. Defendants were each aware of Boeing's contracts with Astech, as they were the very contracts Ten Oaks sought to assume from GKN.

119. Defendants intentionally caused Astech to halt the production and/or delivery of parts that Astech was obligated to supply to Boeing, in breach of Astech's contract with Boeing. Defendants did so in an attempt to force Boeing to agree to increased parts prices.

120. Defendants' actions were not justified. Ten Oaks, including its partners Lovrovich and Richeson, its owners Magan and Hahn, were aware of the terms, including

31

pricing, of the contract with Boeing before acquiring Astech from GKN, and never once raised pricing or the unprofitability of the contracts with Boeing before the acquisition.

121. As a result of Defendants' interference with the contract between Boeing and Astech, Boeing has been injured by Defendants' misrepresentations and omissions.

## COUNT IV: UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF N.C. GEN. STAT. § 75-1.1
### Against All Defendants

122. Boeing realleges each and every allegation contained in paragraphs 1-121 above as if fully set forth herein.

123. Defendants engaged in unfair and deceptive trade practices by developing and executing a plan to fraudulently induce Boeing's consent to the assignment of the Supply Agreements and then, in furtherance of that plan, making a series of misrepresentations calculated to deceive Boeing, both verbally and in writing, as described above.

124. Defendants' actions affected commerce by disrupting Boeing's supply chain, specifically the purchase and sale of the safety critical parts manufactured by Astech, which are part of Boeing's regular course of business.

125. Defendants' actions proximately caused injury to Boeing. Boeing reasonably and justifiably relied on Defendants' representations when it agreed to the CTA, and Defendants knew and intended that Boeing would rely on their representations in deciding whether to execute the CTA. Boeing seeks damages, including, but not limited to, Boeing's costs to secure the parts Astech was obligated to manufacture under the Supply Agreements, including, but not limited to, cover damages, design costs and costs incurred to transition to an alternative supplier, among other damages, along with any lost profits.

## COUNT V: CIVIL CONSPIRACY
### Against Magan, Hahn, Lovrovich, and Richeson

126. Boeing realleges each and every allegation contained in paragraphs 1-125 above as if fully set forth herein.

127.  Magan, Hahn, Lovrovich, and Richeson agreed to act pursuant to a common scheme to fraudulently induce Boeing's consent to the Supply Agreements. The conspiracy was conceived of, led, and directed by Defendants Magan and Hahn, and carried out by Defendants Lovrovich and Richeson.

128.  In furtherance of the conspiracy, Magan and Hahn directed Lovrovich and Richeson to make a series of intentional misrepresentations to Boeing about financial and operational improvements Ten Oaks would make for Astech, as described above, and Lovrovich and Richeson actually made those misrepresentations.

129.  As a result of the individual Defendants' conspiracy and the misrepresentations that furthered it, Boeing has been injured, as described above.

## PRAYER FOR RELIEF

WHEREAS, Plaintiff The Boeing Company respectfully requests that this Court award the following relief:

a.  Compensatory and punitive damages in an amount to be proven at trial;

b.  Treble damages pursuant to N.C. Gen. Stat. § 75-1.1;

c.  Pre- and post-judgment interest, to the extent allowable;

d.  All fees, costs, and expenses, including reasonable attorneys' fees related to this action; and

e.  Such other and further relief as the Court deems just and proper.

Dated: February 2, 2024

Respectfully Submitted,

s/ *Joseph A. Mahoney*

Joseph A. Mahoney
N.C. State Bar No. 55318
MAYER BROWN LLP
214 North Tryon Street, Suite 3800
Charlotte, NC 28202
(704) 444-3654
jamahoney@mayerbrown.com

J. Gregory Deis (*pro hac vice*)
Ethan Hastert (*pro hac vice* application
forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
gdeis@mayerbrown.com
ehastert@mayerbrown.com

Glenn K. Vanzura (*pro hac vice*)
MAYER BROWN LLP
333 South Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 229-9500
gvanzura@mayerbrown.com

Andrew J. Spadafora (*pro hac vice*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3043
aspadafora@mayerbrown.com

34

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on February 2, 2024, a copy of the foregoing

was served on all parties of record in this case by CM/ECF:

Patrick E. Kelly
Michael J. Hoefling
Katie Burchette
J. Nathanial Pierce
JOHNSTON, ALLISON & HORD, P.A.
1065 East Morehead Street
Charlotte, NC 28204
(704) 332-1181
pkelly@jahlaw.com
mhoefling@jahlaw.com
kburchette@jahlaw.com
npierce@jahlaw.com

Michael K. Forde
Brian P. O'Meara
Forde & O'Meara LLP
191 North Wacker Drive, 31st Floor
Chicago, Illinois 60606
(312) 641-1441
mforde@fordellp.com
bomeara@fordellp.com


*/s/ Joseph A. Mahoney*
Joseph A. Mahoney

35