# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:22-CV-00481-KDB-DCK

THE BOEING COMPANY,

Plaintiff,

v.

TEN OAKS MANAGEMENT, LLC, et al.

Defendants

---

TEN OAKS MANAGEMENT, LLC, and DAVID RICHESON,

Counterclaimants

AEP LEGACY HOLDINGS, LLC,

Third-Party Plaintiff

v.

THE BOEING COMPANY,

Counter-Defendant, and

BARBARA ZETTERBERG, CORY GIONET, and RODNEY ARMSTRONG,

Third-party Defendants.

**ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND THIRD-PARTY COMPLAINT**

NOW COME Defendants Ten Oaks Management LLC ("Ten Oaks Management"), Andrew Lovrovich ("Lovrovich"), David Richeson ("Richeson"), Matthew Magan ("Magan"), and Michael Hahn ("Hahn") (collectively, "Defendants"), by and through undersigned counsel, responding to the Second Amended Complaint filed by Plaintiff The Boeing Company ("Plaintiff" and/or "Boeing") as follows:

## NATURE OF THE ACTION

1. Denied.

2. The referenced Supply Agreements speak for themselves. To the extent the allegations of Paragraph 2 conflict with the terms of the written Supply Agreements, such allegations are denied. It is admitted that Astech Engineered Products, Inc., formerly known as Njord Power Intermediate, a Delaware corporation (the "Astech Buyer"), manufactured aerospace products for Boeing and others and assumed the Supply Agreements from GKN Aerospace Chemtronics Inc., a California corporation ("GKN Aerospace"). Defendants deny the remaining allegations of Paragraph 2.

3. It is admitted that GKN sought to sell its Astech Engineered Products division (the "Astech Business"). It is further admitted that Ten Oaks Group is a Charlotte-based family office that specializes in corporate divestitures. It is specifically denied that Boeing did not know that Ten Oaks Group specializes in acquiring "unwanted business" from other companies, as on January 19, 2022, Ten Oaks Management informed Boeing that "Ten Oaks specializes in purchasing corporate divestitures that have become non-core for the parent owner." Defendants deny the remaining allegations of Paragraph 3.

4. Denied. GKN (and not the Astech Buyer) was required to seek the consent of Boeing to assign the Supply Agreements under the terms thereof. It is admitted that Boeing provided the requested consent in the Consent to Assignment, which speaks for itself. To the extent the allegations of Paragraph 4 conflict with the terms of the Supply Agreements or the CTA, such allegations are denied.

5. It is admitted that the Astech Buyer made certain representations and warranties to Boeing in Sections 4, 5, and 10 of the CTA. It is further admitted that Section 22 of the CTA

2

provided a merger clause that sets forth the entire agreement and financial representations between the parties. Defendants deny the remaining allegations of Paragraph 5.

6. It is admitted that Ten Oaks Management informed Boeing that "[g]iven the pro forma balance sheet of the business," Ten Oaks Management provided an "estimated borrowing base using precedent terms from [its] ABL partners" and anticipated that it "would be able to secure a facility of up to ~$18M". It is specifically denied that Defendants represented to Boeing that Ten Oaks Management would "adequately capitalize Astech immediately upon the closing of the acquisition." In response to a written request from Raj Hans, Treasury & Risk Analyst for Boeing Capital Corporation, as to whether Ten Oaks Management would "sign a letter of guarantee in support of Astech contracts with Boeing," Ten Oaks Management responded that "[t]he portfolio companies within Ten Oaks Group are owned by the individual family investors, who are not in a position to provide personal guaranties on behalf of the portfolio companies." Defendants deny the remaining allegations of Paragraph 6.

7. Denied.

8. It is admitted, upon information and belief, that the Astech Business was the only supplier and manufacturer of certain parts to Boeing. It is further admitted that Ten Oaks Management has provided certain management services to the Astech Buyer pursuant to a written Management Services Agreement. Defendants deny the remaining allegations of Paragraph 8.

9. Denied.

10. Denied.

11. It is admitted that both GKN and Ten Oaks Management provided Boeing with certain financial information about the Astech Business. It is further admitted that Boeing was

3

well aware of the Astech Business's financial condition when Boeing agreed to the CTA. Except as admitted, denied.

12. It is denied that Boeing and Ten Oaks Management did not discuss increased pricing prior to the acquisition. Specifically, during a meeting with representatives of Ten Oaks Management, Boeing and GKN that was held on February 10, 2022, Barbara Zetterberg, Director of Contracts and Sourcing for Boeing, stated that price increases were not allowed under the Supply Agreements. In response, Lori Day, Senior Vice President of GKN, immediately responded to Ms. Zetterberg that price increases were in fact allowed under the Supply Agreements, and Ms. Zetterberg did not dispute this assertion. Defendants deny the remaining allegations of Paragraph 12.

13. Denied.

14. Denied.

15. It is admitted that the Astech Buyer filed a Chapter 11 bankruptcy petition in the U.S. District Court for the District of Delaware on July 15, 2023. It is further admitted that on September 8, 2022, the District Court entered an order granting the Astech Buyer's request to reject the Supply Agreements under Federal Rule of Bankruptcy Procedure 6006. Any statements by Richeson or filings by the Astech Buyer in the bankruptcy proceedings stand for themselves. To the extent the allegations of Paragraph 15 conflict with the statements or filings, such allegations are denied. Defendants deny the remaining allegations of Paragraph 15.

16. Denied. Any statements by Richeson or filings by the Astech Buyer in the bankruptcy proceedings stand for themselves. To the extent the allegations of Paragraph 16 conflict with the statements or filings, such allegations are denied. Defendants deny the remaining allegations of Paragraph 16.

17. It is admitted, upon information and belief, that Esterhay filed a proof of claim in the bankruptcy proceeding and an action in California state court that was subsequently dismissed. It is further admitted that Esterhay filed a complaint against Ten Oaks Management in the Western District of North Carolina in which Ten Oaks Management has denied all wrongdoing and moved for dismissal. Except as admitted, denied.

18. Denied.

19. Denied.

## PARTIES

20. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 20, and therefore deny them.

21. Admitted.

22. It is admitted that David Richeson is a citizen of North Carolina, conducts business in North Carolina, and is an operating partner for Ten Oaks Management. Except as admitted, denied.

23. It is admitted that Andrew Lovrovich is an agent of Ten Oaks Management. Except as admitted, denied.

24. Admitted.

25. It is admitted that Michael Hahn is an owner of Ten Oaks Management. Except as admitted, denied.

## JURISDICTION AND VENUE

26. The allegations set forth in Paragraph 26 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

5

27. The allegations set forth in Paragraph 27 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

28. The allegations set forth in Paragraph 28 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

29. The allegations set forth in Paragraph 29 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

30. The allegations set forth in Paragraph 30 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

31. It is admitted that Defendant Lovrovich is a resident of Washington, Defendant Hahn is a resident of California, and Defendants Richeson and Magan are residents of North Carolina. It is further admitted that no member of Ten Oaks Management is a citizen of the State of Delaware or the Commonwealth of Virginia. It is further admitted that Ten Oaks Management's principal place of business is in North Carolina and the four officers identified in Ten Oaks Management's Delaware Certificate of Formation—Defendants Magan, Hahn, Lovrovich, and a fourth individual, Curtis Griner—are citizens of North Carolina, California, Washington and North Carolina, respectively. The remaining allegations set forth in Paragraph 31 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

32. The allegations set forth in Paragraph 32 constitute legal conclusions to which no response is required of Defendants, and thus, are denied.

## **BACKGROUND**

33. It is admitted that Ten Oaks Group is a family office founded by Defendants Magan and Hahn that is focused exclusively on investing in corporate divestitures. Defendants deny the remaining allegations of Paragraph 33.

6

34.     It is admitted that the Astech Buyer previously manufactured airplane parts (prior to the sale of substantially all of its assets as a going concern in the Astech Buyer bankruptcy proceeding).  Defendants deny the remaining allegations of Paragraph 34.

35.     The referenced Supply Agreements speak for themselves. To the extent the allegations of Paragraph 35 conflict with the terms of the Supply Agreements, such allegations are denied.  Defendants deny the remaining allegations of Paragraph 35.

36.     It is admitted that GKN sought a buyer for the Astech Business.  Except as admitted, denied.

37.     It is admitted that on December 2, 2021, the Astech Buyer agreed to purchase certain assets and to assume certain liabilities of the Astech Business from GKN Aerospace pursuant to a written Asset Purchase Agreement.  It is further admitted that pursuant to the terms of the written Asset Purchase Agreement, GKN transferred the amount of $6,669,000 to the Astech Buyer, and that this amount was intended to fund the Astech Buyer's working capital requirements. It is specifically denied that GKN made any payment to Ten Oaks Management or any other Defendant.  It is further specifically denied that Boeing was unaware that GKN intended to make a cash contribution to the Astech Buyer upon the closing of the transaction.  Upon information and belief, on or around January 5, 2023, GKN informed Boeing in writing that "GKN Aerospace Chem-tronics will provide the ASTECH Engineered Products business with a cash contribution of at least $2.5 million at the closing of the transaction."  Except as admitted, denied.

38.     The referenced Supply Agreements speak for themselves. To the extent the allegations of Paragraph 38 conflict with the terms of the Supply Agreements, such allegations are denied.  Defendants deny the remaining allegations of Paragraph 38 as such allegations relate to communications with other parties and not Defendants.

39. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 39, and therefore, the allegations are denied.

40. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 40 concerning Boeing's evaluation of the Astech Business's financial viability, and therefore, the allegations are denied. Defendants deny the remaining allegations of Paragraph 40.

41. The allegations of Paragraph 41 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 41 conflict with the referenced document(s), such allegations are denied.

42. It is admitted that Boeing requested certain information, including a pro forma financial statement, from Ten Oaks Management regarding plans related to the Astech Business. Except as admitted, denied.

43. The allegations of Paragraph 43 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 43 conflict with the referenced document(s), such allegations are denied.

44. The allegations of Paragraph 44 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 44 conflict with the referenced document(s), such allegations are denied.

45. The allegations of Paragraph 45 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 45 conflict with the referenced document(s), such allegations are denied.

8

46. The allegations of Paragraph 46 reference written documents which content speaks for itself. To the extent the allegations of Paragraph 46 conflict with the referenced documents, such allegations are denied.

47. The allegations of Paragraph 47 reference written communications which contents speak for itself. To the extent the allegations of Paragraph 47 conflict with the referenced communications, such allegations are denied. Further, Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 47 concerning any conclusions Boeing drew or the reasonableness or unreasonableness of those conclusions and therefore deny them. Defendants deny the remaining allegations of Paragraph 47.

48. It is admitted that Ten Oaks Management responded to certain inquiries from Boeing in writing. The written communications speak for themselves. To the extent the allegations of Paragraph 48 conflict with the referenced communications, such allegations are denied. Further, Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 48 concerning any conclusions Boeing drew or the reasonableness or unreasonableness of those conclusions and therefore deny them. Defendants deny the remaining allegations of Paragraph 48

49. The allegations of Paragraph 49 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 49 conflict with the referenced document(s), such allegations are denied.

50. It is admitted that Boeing sought certain information from Ten Oaks Management via written inquiries. To the extent the allegations of Paragraph 50 conflict with the referenced communications, such allegations are denied.

9

51.     It is admitted that Ten Oaks Management responded to certain inquiries from Boeing in writing. The written communications speak for themselves. To the extent the allegations of Paragraph 51 conflict with the referenced communications, such allegations are denied.

52.     It is admitted that Ten Oaks Management responded to certain inquiries from Boeing in writing. The written communications speak for themselves. To the extent the allegations of Paragraph 52 conflict with the referenced communications, such allegations are denied. Further, Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 52 concerning any conclusions Boeing drew or the reasonableness or unreasonableness of those conclusions and therefore deny them. It is specifically denied that Defendants mislead Boeing. Except as admitted, denied.

53.     Denied. It is specifically denied that the Defendants perpetrated some scheme or fraud against Boeing as alleged.

54.     It is admitted that Boeing requested an in-person meeting and that limited phone calls between Boeing and Ten Oaks Management occurred. Except as admitted, denied.

55.     The allegations of Paragraph 55 reference a written document which contents speak for itself. To the extent the allegations of Paragraph 55 conflict with the referenced document(s), such allegations are denied.

56.     It is admitted that representatives of Boeing and Ten Oaks Management met in person at Boeing's offices in Everett, Washington, on or about February 10, 2022 with Richeson and Lovrovich attending. Richeson and Lovrovich made accurate representations to Boeing about their background at the referenced meeting. Except as admitted, denied.

57.     It is admitted that Richeson and Lovrovich presented to Boeing at the February 10, 2022 meeting and made accurate statements to Boeing during this meeting. The remaining

10

allegations of Paragraph 57 reference a written presentation, of which the content speaks for itself. To the extent the allegations of Paragraph 57 conflict with the referenced presentation, such allegations are denied.

58.     It is admitted that Richeson and Lovrovich made accurate statements about previous acquisitions to Boeing at the meeting.  It is specifically denied that Defendants made fraudulent or negligent misrepresentations to Boeing.  To the extent the allegations of Paragraph 58 quote a written presentation or document, such document speaks for itself.  To the extent the allegations of Paragraph 58 conflict with the referenced presentation, such allegations are further denied.  Except as admitted, denied.

59.     It is admitted that Richeson and Lovrovich presented to Boeing at the February 10, 2022 meeting.  It is specifically denied that Defendants made fraudulent or negligent misrepresentations to Boeing.  To the extent the allegations of Paragraph 59 quote a written presentation or document, such document speaks for itself.  To the extent the allegations of Paragraph 59 conflict with the referenced presentation, such allegations are further denied.  Except as admitted, denied.

60.     It is admitted that Richeson and Lovrovich presented to Boeing at the February 10, 2022 meeting.  It is specifically denied that Defendants made fraudulent or negligent misrepresentations to Boeing.  To the extent the allegations of Paragraph 60 quote a written presentation or document, such document speaks for itself.  To the extent the allegations of Paragraph 60 conflict with the referenced presentation, such allegations are further denied.  Except as admitted, denied.

61.     Denied.

62. It is admitted that Richeson and Lovrovich presented to Boeing at the February 10, 2022 meeting. It is specifically denied that Defendants made fraudulent or negligent misrepresentations to Boeing. To the extent the allegations of Paragraph 62 quote a written presentation or document, such document speaks for itself. To the extent the allegations of Paragraph 62 conflict with the referenced presentation, such allegations are further denied. Except as admitted, denied.

63. It is admitted that a Boeing representative inquired into the experience and knowledge of Richeson and Lovrovich at the February 10, 2022 meeting and that Richeson had significant manufacturing experience in the automotive industry. Except as admitted, denied.

64. It is admitted that no Boeing representative ever asked Defendants if they intended to seek price increases nor sought confirmation of such a fact from Defendants. It is denied that Boeing and Ten Oaks Management did not discuss increased pricing prior to the acquisition. Specifically, during a meeting with representatives of Ten Oaks Management, Boeing and GKN that was held on February 10, 2022, Barbara Zetterberg, Director of Contracts and Sourcing for Boeing, stated that price increases were not allowed under the Supply Agreements. In response, Lori Day, Senior Vice President of GKN, immediately responded to Ms. Zetterberg that price increases were in fact allowed under the Supply Agreements, and Ms. Zetterberg did not dispute this assertion. Except as admitted, denied.

65. Denied.

66. Denied.

67. Denied. It is specifically denied that Ten Oaks Management obtained $7 Million in cash through the acquisition and, upon information and belief, Boeing is and was aware that this allegation is false. Pursuant to the terms of the written Asset Purchase Agreement, GKN

transferred the amount of $6,669,000 to the Astech Buyer, and that this amount was intended to fund the Astech Buyer's working capital requirements. It is specifically denied that GKN made any payment to Ten Oaks Management or any other Defendant. Any statements by Richeson or filings by the Astech Buyer in the bankruptcy proceedings stand for themselves. To the extent the allegations of Paragraph 62 conflict with the statements or filings, such allegations are denied.

68. It is admitted that Boeing was well aware of the Astech Business's financial circumstances around the time of the referenced acquisition. It is specifically denied that Boeing was unaware that GKN intended to make a cash contribution to the Astech Buyer upon the closing of the transaction. Upon information and belief, on or around January 5, 2023, GKN informed Boeing in writing that "GKN Aerospace Chem-tronics will provide the ASTECH Engineered Products business with a cash contribution of at least $2.5 million at the closing of the transaction." It is further specifically denied that Ten Oaks Management obtained $7 Million in cash through the acquisition and, upon information and belief, Boeing is and was aware that this allegation is false. Pursuant to the terms of the written Asset Purchase Agreement, GKN transferred the amount of $6,669,000 to the Astech Buyer, and that this amount was intended to fund the Astech Buyer's working capital requirements. It is specifically denied that GKN made any payment to Ten Oaks Management or any other Defendant. Except as admitted, denied.

69. It is specifically denied that Defendants Hahn and Magan keep Ten Oaks Management's cash in their personal bank accounts. It is further specifically denied that GKN made any payment to Ten Oaks Management or any other Defendant. The remaining allegations of Paragraph 69 are denied.

70. Denied.

71. Denied.

72.     It is admitted that on March 25, 2022, the Astech Buyer engaged an equipment appraisal company that performed an in-person assessment of the Astech Buyer's equipment.  The remaining allegations of Paragraph 72 are denied.

73.     Denied.

74.     Denied.

75.     It is admitted that Andrew Lovrovich and David Richeson attended a meeting with Boeing on May 25, 2022.  Responding further, the referenced Supply Agreements speak for themselves. To the extent the allegations of Paragraph 75 conflict with the terms of the Supply Agreements, such allegations are denied.  Defendants deny the remaining allegations of Paragraph 75.

76.     It is admitted that Lovrovich communicated accurately about investments in the Astech Buyer. Except as admitted, denied.

77.     It is admitted that Richeson was the Executive Chairman of the Astech Buyer at the time.  Except as admitted, denied.

78.     It is admitted that Ten Oaks Management provided investment in time and expertise to assist the Astech Buyer during the relevant timeframe.  Paragraph 78 references a written agreement of which the content speaks for itself.  To the extent the allegations of Paragraph 78 conflict with the referenced agreement, such allegations are further denied.  Except as admitted, denied.

79.     Denied.

80.     It is admitted that the parties discussed issues related to the delivery of parts.  Except as admitted, denied.

81. The allegations of Paragraph 81 reference a written document, such document speaks for itself. To the extent the allegations of Paragraph 81 conflict with the referenced document, such allegations are further denied. Except as admitted, denied.

82. It is admitted that the Astech Buyer's legal counsel held a proposed meeting on or about June 20, 2022 with Boeing's legal counsel attending. Except as admitted, denied.

83. It is admitted that the Astech Buyer filed bankruptcy on or about July 15, 2022. Except as admitted, denied.

84. The allegations of Paragraph 84 reference public, written documents which speak for themselves. To the extent the allegations of Paragraph 84 conflict with the referenced documents, such allegations are denied. Except as admitted, denied.

85. The allegations of Paragraph 85 reference statements in deposition testimony by Richeson which speak for themselves. To the extent the allegation of Paragraph 85 conflict or misstate the referenced testimony, such allegations are denied. The allegations of Paragraph 85 are expressly denied as to Boeing's characterizations of the Defendants' alleged conduct, and it is denied that Defendants made misrepresentations to Boeing. Except as stated, otherwise denied.

86. It is admitted that Esterhay filed a proof of claim and a civil complaint. The allegations of Paragraph 86 reference written documents which speak for themselves. To the extent the allegations of Paragraph 86 conflict with the referenced documents, such allegations are denied. Defendants deny the veracity of the allegations of Esterhay. Except as admitted, denied.

87. Denied.

88. Denied.

89. It is admitted that Richeson testified in a separate proceeding about the nature of Ten Oaks Management' due diligence process. The allegations of Paragraph 89 reference

15

statements in deposition testimony by Richeson which speak for themselves. To the extent the allegations of Paragraph 89 conflict or misstate the referenced testimony, such allegations are denied. Except as admitted, otherwise denied.

90. It is admitted that the Astech Business's contracts were in place prior to the referenced acquisition by the Astech Buyer. It is expressly denied that Ten Oaks Management misrepresented Ten Oaks Management's alleged "strategy," and Defendants deny Esterhay's allegations of fraud. Except as admitted, denied.

91. It is admitted that Richeson testified in a separate proceeding. The allegations of Paragraph 91 reference statements in deposition testimony by Richeson which speak for themselves. To the extent the allegations of Paragraph 91 conflict or misstate the referenced testimony, such allegations are denied. Except as admitted, otherwise denied.

92. Denied.

93. Denied.

94. Denied.

95. Denied.

96. Denied.

97. Denied.

98. Denied.

99. Denied.

### COUNT I: FRAUDULENT MISREPRESENTATION
**Against Ten Oaks Management, Lovrovich, and Richeson**

100. Defendants hereby incorporate by reference the responses to previous paragraphs above in their entirety as if recited herein.

101. Denied.

16

102. Denied.

103. Denied.

104. Denied.

105. Denied.

106. Denied.

107. Denied.

108. Denied.

109. To the extent a response is required, denied.

## COUNT II: NEGLIGENT MISREPRESENTATION
### (In the Alternative to Count I)
### Against Ten Oaks Management, Lovrovich, and Richeson

110. Defendants hereby incorporate by reference the responses to previous paragraphs above in their entirety as if recited herein.

111. Paragraph 111 asserts legal conclusions that do not require a response. To the extent a response is required, denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

## COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT
### Against All Defendants

116. Defendants hereby incorporate by reference the responses to previous paragraphs above in their entirety as if recited herein.

117. It is admitted that Boeing had contracts with the Astech Buyer for the supply of various parts. Except as admitted, denied.

17

118.    It is admitted that Defendants were aware of certain contracts between Boeing and the Astech Buyer.  Except as admitted, denied.

119.    Denied.

120.    Denied.

121.    Denied.

## COUNT IV: UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF N.C. GEN. STAT. § 75-1.1

### Against All Defendants

122.    Defendants hereby incorporate by reference the responses to previous paragraphs above in their entirety as if recited herein.

123.    Denied.

124.    Denied.

125.    Denied.

## COUNT V: CIVIL CONSPIRACY

### Against Magan, Hahn, Lovrovich, and Richeson

126.    Defendants hereby incorporate by reference the responses to previous paragraphs above in their entirety as if recited herein.

127.    Denied.

128.    Denied.

129.    Denied.

## FIRST AFFIRMATIVE DEFENSE

To the extent that Plaintiff's claims against Defendants are in violation of the applicable statute of limitations and/or statue of repose, the claims against Defendants are time barred.

18

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, estoppel, and unclean hands, including, but not limited to, Boeing's wrongful conduct related to the Astech Buyer's lease.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff is barred and estopped from recovery against Defendants to the extent Plaintiff has failed to mitigate its damages.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries or damages, if any, were caused in whole or in part by the conduct of one or more persons or entities for whose conduct Defendants were not responsible for, including, without limitation, John "Jack" Esterhay.

## FIFTH AFFIRMATIVE DEFENSE

To the extent Plaintiff fails to state a claim upon which relief can be granted, the lawsuit should therefore be dismissed pursuant to Rule 12(b)(6).

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to identify with sufficient particularity in its allegations as to enable Defendants to delineate, among other things, the time, place, and manner of the alleged fraudulent conduct, the persons making the alleged misrepresentation(s), and how Boeing reasonably relied upon said alleged misrepresentation(s) to its detriment.

## SEVENTH AFFIRMATIVE DEFENSE

At all times Defendants acted reasonably, with appropriate diligence, and in good faith, including in its interactions with Plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its lack of injury and/or damages resulting from any actions or representations of Defendants.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claim for fraudulent misrepresentation and negligent misrepresentation are barred because Defendants made no material misrepresentation(s) of past or existing fact. Such claims are further barred by Boeing's negligent failure to inquire into any pricing commitments with the Astech Business or Defendants.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claim for fraudulent misrepresentation and negligent misrepresentation are barred because Defendants owed Plaintiff no duty, the statements of Defendants were truthful, and Boeing did not reasonably rely upon Defendants' statements.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims for fraudulent misrepresentation and negligent misrepresentation are barred by Plaintiff's own failure to investigate or any other acts of negligence that contributed to Plaintiff's alleged harm.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiff's claim for fraudulent misrepresentation and negligent misrepresentation are barred as all pre-contract representations made by Defendants, if any, merged with the terms of the Consent to Assignment of the contracts from GKN.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claim for tortious interference with contract is barred by Defendants' status as non-outsiders to the contract(s) at issue. Further, Defendants did not intentionally induce the Astech Buyer and, to the extent they acted, did not act without justification.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, as Defendants are not the proximate cause of the alleged damages against Boeing and Boeing may be entitled to recovery of its alleged damages against other parties, including, without limitation, the Astech Buyer through the bankruptcy proceeding.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Defendants are entitled to recovery of attorneys' fees under, without limitation, N.C. Gen. Stat. 75-16.1, to the extent Defendants show that Boeing knew or should have known the action was frivolous and malicious.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Boeing's claims are barred as a result of the clear terms of the Consent to Assignment, whereby Boeing sets forth the specific financial representations made by Astech Buyer in which its Enterprise Credit Risk office specifically relied upon, including, but not limited to, those warranties and representations by non-defendant parties set forth therein. Further, Boeing's claims are barred by the doctrine of merger as a result of the language of the merger clause in the Consent to Assignment, which notes that the provisions therein, including the representations, constitute the entire agreement between the parties.

20

## SEVENTEENTH AFFIRMATIVE DEFENSE

Boeing shall be barred from any recovery as a result of its own contributory negligence by failing to act reasonably and prudently and said negligence was the proximate cause or contributing cause of the alleged injuries or damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Boeing shall be barred from any recovery as a result of the doctrine of assumption of risk and Boeing assuming the risk of, among other things, the potential failure of Astech Buyer's business and/or filing of bankruptcy in accord with the federal bankruptcy statutes.

## NINETEENTH AFFIRMATIVE DEFENSE

Boeing's claims are barred by its own fraudulent, negligent, and/or unfair and deceptive conduct against Defendants, Counterclaimants, and Third Party Plaintiff with said allegations of the Counterclaim and Third-Party Complaint incorporated herein by reference, including Boeing's and its representatives' material misrepresentations, omissions, and otherwise deceptive conduct.

## GENERAL RESERVATION OF ADDITIONAL DEFENSES

Defendants reserve all other and further defenses which may become known thereto as determined throughout discovery in this matter, including, but not limited to, all defenses that undercut the necessary elements of Plaintiff's causes of action.

## COUNTERCLAIM/THIRD-PARTY COMPLAINT

Defendant-Counterclaimants Ten Oaks Management, LLC ("Ten Oaks Management") and David Richeson ("Richeson") and Third-Party Plaintiff AEP Legacy Holdings, LLC, formerly known as ASTECH Holdings, LLC ("AEP") (collectively the "Counterclaimants"), bring this Counterclaim and Third-Party Complaint and allege as follows:

## INTRODUCTION

1.     This case arises from Boeing's fraudulent and deceptive conduct in conning Counterclaimants into buying a key Boeing supplier that was prepared to shut down its operations. Boeing, which was the beneficiary of a lopsided contract with that supplier, wanted to continue to reap the benefits of that contract and did not want that supplier to cease operations. So, to avoid losing this sweetheart deal, Boeing fraudulently induced Counterclaimants into buying that

21

supplier. Boeing's fraud included (a) intentional concealment of material facts from the Counterclaimants about the nature and history of the Boeing-supplier contract; (b) intentional concealment of Boeing's yearslong preparation for the closure of the supplier and its efforts to locate alternative suppliers and/or redesign the parts provided by the supplier; and (c) false statements about Boeing's financial support, all towards inducing Counterclaimants to acquire the supplier and assume its contract with Boeing.

2. Boeing's fraudulent conduct towards Counterclaimants is part of a larger pattern and practice of fraudulent conduct by Boeing with respect to parts manufactured by one of their suppliers. In a pending lawsuit that arises from the February 10, 2022 announcement that Boeing's supplier, GKN Aerospace St. Louis, LLC ("GKN St. Louis"), intended to close its Hazelwood, Missouri facility that manufactures parts for Boeing, GKN St. Louis has alleged, within a January 12, 2024 filing, that "[t]hrough its investigation of Boeing's allegations and the discovery process in this case, GKN St. Louis learned that Boeing fraudulently induced GKN St. Louis to enter into the Strategic Agreements [that included 30% price reductions]" by misrepresenting the price and availability of parts from other suppliers. Suggestion in Supp. Of Def. GKN Aerospace St. Louis LLC's Mot. For Leave to Amend and Supplement Its Answer, at 10 (22SL-CC05336, January 12, 2024).

3. Boeing is a multinational conglomerate with a market capitalization of over $150 billion, making it one of the 100 largest companies in the world. It has over $75 billion in annual revenue. According to its website, Boeing employs approximately 145,000 employees across the United States and in more than 65 countries. In short, Boeing is a sophisticated, global Goliath, with immense market power, knowledge, and leverage, especially within the aerospace industry.

4. In recent years, Boeing has found itself mired in controversy, casting a long shadow over its reputation and operational integrity. The public record is replete with instances of Boeing's financial and operational missteps, culminating in a crisis of confidence among investors, regulators, and the public at large.  For example, a recent New York Times article observed, "By 2020, Boeing itself had in a way been stretched, redesigned and repowered in a series of corporate restructurings that each yielded its own defects. … What got lost in all this shuffling is a corporate culture that once prized engineering and safety, replaced by one that seemed to be more focused on delivering profits over perfection."  Bill Saporito, *Boeing Made a Change to Its Corporate Culture Decades Ago. Now It's Paying the Price*, N.Y. TIMES, Jan. 23, 2024.

5. This counterclaim is set against the backdrop of Boeing's much-publicized struggles with its Boeing 767 jet airliner and related Boeing KC-46 Pegasus tanker military refueling aircraft. The 767 program, critical to both commercial aviation and military operations, has been plagued by delays, quality issues, and cost overruns. These problems have been exacerbated by Boeing's mismanagement of its supply chain, and marked by a lack of transparency, poor communication with suppliers, and a relentless drive to cut costs at the expense of quality and reliability.

6. In February 2011, the Boeing KC-46 Pegasus tanker was selected by the United States Air Force (USAF) as the winner in a competition to replace older tanker aircraft. Within six months following the award of this contract, however, development costs were reportedly projected to overrun by about $300 million. Cost overruns have only continued to increase throughout the troubled life of this program.

7. In July 2014, Boeing recorded a $272 million pre-tax charge to cover a redesign for the KC-46's faulty wiring. And, in July 2015, Boeing announced a further $835 million pretax

charge for the redesign and retrofit of the KC-46's faulty integrated fuel system. In April 2016, Boeing took another pre-tax charge of $243 million for cost overruns, bringing the total amount paid for tanker cost overruns to $1.5 billion. In July 2016, Boeing took a further $393 million charge on the program. ***Ultimately, by January 2021, Boeing's losses on the KC-46 program were estimated at approximately $5 billion.***

8. It is within this context of operational upheaval and financial distress that Boeing, desperate to stabilize production of the KC-46 Pegasus tanker and mitigate its financial woes, engaged in a series of fraudulent conduct towards Counterclaimants.

9. In 2012, Boeing executed a long-term contract with GKN Aerospace Chem-Tronics Inc. d/b/a Astech Engineered Products ("GKN Astech"), a subsidiary of a U.K. company called GKN Ltd. ("GKN"). That contract ran through 2028 and obligated GKN Astech to provide Boeing with certain equipment (mainly exhaust kits and spare parts) that Boeing required for certain aircraft, including the Boeing 767 and Boeing KC-46 Pegasus. The contract contained a price schedule for determining the prices for this equipment over the 16-year life of the contract.

10. That contract proved to be extremely favorable to Boeing – and unfavorable to GKN Astech – over time. This was primarily due to the price schedule, which over time proved far too low to even recoup GKN Astech's manufacturing costs. This price schedule required GKN Astech to sell the equipment to Boeing at prices that were a mere fraction of the costs of manufacturing the kits. In 2022, for example, the contract provided for a sales price of each exhaust kit of approximately $90,000 – even though the manufacturing costs of each kit were approximately $210,000. Thus, the contract required Boeing's counterparty to manufacture each kit at a ***loss*** of approximately $120,000 ***per kit***. For another part required under the same contract,

24

the disparity was similar: approximately $156,000 in costs, and an approximately $64,000 contract price, for a *loss* of approximately $92,000 *per part*.

11.     Boeing knew that this disparity was not sustainable.  Upon information and belief, GKN repeatedly asked Boeing to adjust the pricing under the contract, so that the terms were not so onerous to GKN Astech.  Boeing consistently refused. Consequently, GKN repeatedly threatened to shut down GKN Astech.  Boeing took these threats seriously as it had substantive discussions with approximately ten alternative suppliers about the possibility of purchasing replacement parts from those suppliers in the event that GKN shuttered GKN Astech.  Boeing also took substantial internal steps to prepare for that possibility, but any such change would come at a substantial cost and delay to Boeing.

12.     This fraught relationship between Boeing and GKN – and the threat to Boeing's profits that it presented – continued until 2021 when a solution appeared.  GKN approached Counterclaimants about acquiring the assets of the GKN Astech business (the "Astech Business"), including an assignment of the GKN Astech-Boeing contract.  Such an acquisition would benefit both GKN and Boeing – it would get the troubled Astech Business and its lopsided Boeing contract off of GKN's hands, and it would keep a key Boeing supplier afloat, sparing Boeing the agony and cost of finding a replacement.

13.     As Counterclaimants considered this acquisition, they were aware of the distressed financial performance of the Astech Business.  As a result, Counterclaimants were concerned about the possibility that they would incur the time and expense of the acquisition, only to find that they were unable to turn the company around. Boeing, eager to close the deal, attempted to alleviate Counterclaimant's concerns, and told them the following, should financials issues arise:

a. Boeing would provide the Astech Business with the financial support that it needed to continue the business, including contributing to the required capital investments to be made by the Astech Business in its equipment; and,

b. Boeing would assist Counterclaimants by investing in the long-term growth and stability of the Astech Business and providing assistance – financial assistance and/or locating a buyer – in the event Counterclaimants were forced to consider bankruptcy.

14. Also, Boeing never told Counterclaimants, and intentionally concealed:

a. That GKN had threatened to close the Astech Business if Boeing would not agree to price increases;

b. That Boeing had repeatedly rejected GKN's requested for price increases for the Astech Business;

c. That Boeing had prepared for, and was currently preparing for, the contingency of a closure of the Astech Business by investigating alternative suppliers or redesigning the products provided by the Astech Business;

d. That Boeing, despite suggestions otherwise, never intended to assist the Astech Business financially or otherwise.

15. In reliance on these affirmative misrepresentations and intentional concealments by Boeing, Counterclaimants closed on the purchase of the Astech Business on March 11, 2022.[1]

16. Almost immediately, the transaction proved disastrous for Counterclaimants.

---

[1] AEP and GKN signed the initial purchase agreement in December 2021. That purchase agreement was essentially a placeholder that required the fulfillment of certain closing conditions before closing. Efforts to fulfill these closing conditions continued all the way through closing in March 2022. Under that purchase agreement, it was a required condition to closing that GKN and Boeing agree on the assignment of the Boeing contract (without conditions), which did not occur until March 3, 2022.

17. There were two main reasons for this, among others. First, it was significantly more difficult for Counterclaimants to improve the economic performance of the Astech Business than Boeing led Counterclaimants to believe and/or concealed. Second, Boeing's promises of financial assistance and flexibility were false.

18. As to the Astech Business's equipment, third-party Defendant Cory Gionet ("Gionet") maintained an office at the Astech Business's facility in Santa Ana, California, and was intimately familiar with the nature and quality of the Astech Business's equipment. Despite this knowledge, Gionet failed to disclose, and intentionally withheld, this information from Counterclaimants. This failure to disclose by Gionet was significant, as Counterclaimants later learned the Astech Business's equipment was highly specialized, rendering the acquisition of replacement equipment in a timely manner to support quality and cost improvements impossible.

19. After four months of dismal financial performance, in July 2022, the Astech Business was forced to file for bankruptcy protection. Despite the extraordinary efforts of the Astech Business's employees and Counterclaimants, the Astech Business could not overcome the onerous Boeing contract and Boeing's misrepresentations and concealments regarding the same. In short, because of Boeing's fraud, Counterclaimants stand to lose everything on this deal, including the value of their time and resources to support the transaction and any investment gains.

20. Boeing's Amended Complaint alleges that Defendants fraudulently induced Boeing to consent to the Defendants' purchase of the Astech business. This is exactly backward. It was Boeing that fraudulently induced Defendants to make that purchase. To demonstrate that point, it is only Boeing that benefitted as a result of that purchase. Defendant-Counterclaimants have suffered a variety of damages, including, but not limited to, costs associated with due diligence, transaction costs, personnel costs, non-payment of management fees, investment losses, and

27

attorneys' fees. In contrast, Boeing was able to keep its preposterously low-price supply chain for many months longer than it would have as a direct result of the acquisition of the Astech Business and efforts by Counterclaimants.

**PARTIES**

21. Ten Oaks Management, LLC is a limited liability company organized and existing under the laws of the State of Delaware that maintains its principal place of business in Charlotte, North Carolina. The members of Ten Oaks Management, LLC are Matt Magan, who is a citizen and resident of North Carolina, and Mike Hahn, who is a citizen and resident of California.

22. David Richeson is a citizen and resident of the State of North Carolina.

23. AEP Legacy Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware that maintains its principal place of business in Charlotte, North Carolina. The members of AEP Legacy Holdings, LLC are Ten Oaks Management, LLC, Dave Richeson (who is a citizen of North Carolina), Cameron Carmichael, Inc. (which is a corporation organized and existing under the laws of the State of North Carolina and that maintains its principal place of business in North Carolina), Mads Adams (who is a citizen of North Carolina), and True Roots LLC (whose member is a citizen of North Carolina).

24. The Boeing Company is a Delaware corporation and maintains its principal place of business in Arlington, Virginia.

25. Barbara Zetterberg is, upon information and belief, a citizen and resident of the State of Washington.

26. Cory Gionet is, upon information and belief, a citizen and resident of the State of Washington.

27. Rodney Armstrong, upon information and belief, is a citizen and resident of the State of Washington.

<u>**JURISDICTION AND VENUE**</u>

28. This Court has jurisdiction over Ten Oaks Management and David Richeson's Counterclaims pursuant to 28 U.S.C. § 1367(a) because the Counterclaim are so related to the claims brought by Boeing that they form part of the same case or controversy. The Court also has jurisdiction over the Counterclaims pursuant to 28 U.S.C. § 1332 based on diversity. Venue is proper for the same reasons.

29. This Court has jurisdiction over AEP's Third-Party Complaint pursuant to 28 U.S.C. § 1367(a) because the Counterclaim is so related to the claims brought by Boeing that they form part of the same case or controversy. The Court also has jurisdiction over the Third-Party Complaint pursuant to 28 U.S.C. § 1332 based on diversity. Venue is proper for the same reason.

<u>**COMMON ALLEGATIONS**</u>

**BOEING AND GKN ASTECH SIGN THE 2012 SUPPLY CONTRACT**

30. In June 2012, Boeing entered into a related group of contracts with GKN Astech. These contracts are collectively referred to herein as "the Supply Contract". The Supply Contract took effect on January 1, 2013. It was a classic "requirements contract", in that, for certain categories of equipment needed for Boeing's "Tanker Program":

a. It required GKN Astech to produce all the equipment that Boeing required;

b. It expired when GKN Astech had provided kits for 179 planes (358 kits total), or December 31, 2028, whichever came first; and,

c. It set the prices for those kits and related equipment for each of the years running through 2028.

29

31.     This combination of features made the Supply Contract very risky for GKN Astech, because it (a) locked GKN Astech into a contract that could last for 16 years; (b) required GKN Astech to undertake a very substantial and expensive obligation to provide Boeing with tens of millions of dollars of equipment; while also (c) locking GKN Astech into a price schedule that was *intended* to cover inflationary changes in GKN Astech's production costs, but with *no guarantee* the schedule would protect GKN Astech.

32.     Boeing and GKN Astech performed accordingly under the Supply Contract.  On information and belief, Boeing purchased approximately 24 kits per year beginning in 2013 for a total of 180, well-below the 358 kits that would trigger the expiration of the Supply Contract.

33.     However, the Supply Contract's price schedule turned out to be hopelessly flawed and failed dramatically to compensate GKN Astech for the changes in its production costs.

34.     As a result, GKN Astech found itself in the unusual and unfavorable position of being contractually required to produce the kits for Boeing, while taking a substantial loss on each product it supplied.

35.     Boeing was in the opposite position.  The long-term contract had worked out to its great advantage.  It had locked GKN Astech into a long-term, disproportionate contract, pursuant to which GKN Astech was selling goods to Boeing at a substantial loss.

36.     The contract price was substantially below the market rates Boeing would have to pay a different supplier under a new contract.  As noted, in 2022, for example, the contract provided for a sales price of each exhaust kit of approximately $90,000 – even though the manufacturing costs of each kit were approximately $210,000.  Thus, the contract required Boeing's counterparty to manufacture each kit at a *loss* of approximately $120,000 *per kit*.  For another part required

under the same contract, the disparity was similar: approximately $156,000 in costs, and an approximately $64,000 contract price, for a *loss* of approximately $92,000 *per part*.

37.     Under the terms of the requirements contract, GKN Astech was obligated to provide all the kits and equipment that Boeing required.

38.     As alleged below, by 2021, both parties were well aware of the advantages to Boeing and the disadvantages to GKN Astech of the Supply Contract, and its implications going forward.

## GKN INVESTIGATES ITS OPTIONS TO TERMINATE GKN ASTECH'S OBLIGATIONS AND BOEING PLANS FOR THOSE CONTINGENCIES

39.     The contractual arrangement between GKN Astech and Boeing caused GKN Astech and its parent company, GKN, to consider closing the Astech Business. As such, Boeing considered alternative suppliers and alternative designs for the parts provided to Boeing by the Astech Business.

40.     According to the deposition of Barbara Zetterberg, on several occasions prior to April 2021, GKN and GKN Astech told Boeing that the pricing on its products under the Supply Contract was a significant financial problem for GKN and GKN Astech.  GKN and GKN Astech also told Boeing that GKN might close the Astech Business, unless Boeing would agree to increase the prices it paid GKN Astech under the Supply Contract.

41.     GKN and GKN Astech continued to communicate this message into 2021, and prior to Counterclaimants' introduction to the possibility of purchasing the assets of GKN Astech.

42.     Zetterberg testified that the possibility that GKN might close the Astech Business was a substantial concern to Boeing.  Boeing had a sweetheart deal that it did not want to lose because there would be substantial costs and delays for Boeing if it had to find an alternative

31

supplier, which Boeing could not afford given that its losses on the KC-46 program at this time already exceeded $5 billion.

43. She also testified that as a result of GKN's threats to close the Astech Business, no later than June 2021, Boeing began investigating alternative sources for the Astech products. This contingency planning, at all times intentionally concealed from Counterclaimants, included: (a) Boeing's engineering department beginning to investigate potential redesigns of the GKN Astech products to obtain from other suppliers, and (b) Boeing approaching eight to ten potential alternate suppliers for comparable equipment.

44. In fact, Boeing's discussions with alternative suppliers went beyond the "approach" stage. Boeing continued discussions with alternative suppliers for a period that includes, at least, the time between June 2021 and March 2022. Such discussions continued through January 2023.

## BOEING DEFRAUDS COUNTERCLAIMANTS INTO INVESTIGATING AND ACQUIRING THE GKN ASTECH ASSETS AND ASSUMING THE SUPPLY CONTRACT

45. In late 2021, a GKN representative told Counterclaimants that GKN was interested in selling the Astech Business. Counterclaimants were interested in the opportunity given their expertise acquiring corporate divestitures and working with distressed companies.

46. Counterclaimants then undertook due diligence to investigate the Astech Business. This due diligence included numerous meetings and other communications with GKN and GKN Astech conducted over a total of eight months between August 2021 and March 2022.

47. The due diligence also included correspondence between Counterclaimants, their agents, and Boeing, and it included an important meeting on February 10, 2022, at Boeing's offices in Everett, Washington. The attendees at that meeting were Zetterberg (Director of Contracts and Sourcing for Boeing), Gionet (Boeing's Director of Operations), and Rodney Armstrong (Boeing's

32

Director of Finance) ("Armstrong") on behalf of Boeing, Lori Day (Senior Vice President) on behalf of GKN, and David Richeson and Andrew Lovrovich on behalf of Ten Oaks Management and AEP. At that meeting, Boeing's representatives made numerous false statements and material omissions to Counterclaimants. These include the following:

a. Zetterberg falsely told Richeson and Lovrovich that if Counterclaimants were to acquire the Astech Business and assume the Supply Contract, and then later determined that the Astech Business was not profitable, Boeing would work with Counterclaimants to provide the Astech Business with necessary financial support to avoid bankruptcy, including financial assistance and/or assistance in finding a buyer for the Astech Business;

b. In that same meeting, Armstrong, knowing such a representation was not true, told Richeson and Lovrovich that if Counterclaimants were to buy the Astech Business and assume the Supply Contract, Boeing would contribute to the costs of Astech Business's capital investments in its equipment;

c. Boeing affirmed its commitment to the Astech Business and emphasized the importance of Astech products to its KC-46 Pegasus tanker program, despite the fact that Boeing was actively attempting to re-source these products from the Astech Business to a new supplier at this time;

d. Boeing and its representatives never told Counterclaimants, in the February 10 meeting or any other time, and intentionally withheld from Counterclaimants, the fact that GKN had threatened to close the Astech Business if Boeing would not agree to price increases;

33

e. Boeing and its representatives never told Counterclaimants, and intentionally withheld from them, the fact that Boeing had repeatedly rejected GKN's requested for price increases for the Astech Business;

f. Boeing and its representatives never told Counterclaimants, in the February 10 meeting or any other time, and intentionally withheld from Counterclaimants, the fact that Boeing had prepared for, and was currently preparing for, the contingency of a closure of the Astech Business by investigating alternative suppliers or redesigning the Astech products; and,

g. Gionet never told Counterclaimants, in the February 10 meeting or any other time, and intentionally withheld from Counterclaimants, the fact that the Astech Business's highly specialized equipment was in a state of general disrepair, was difficult to repair, and was nearly impossible to replace. This concealment occurred despite Gionet bragging about the fact that he had an office in the Astech facility, knew well the Astech Business operations, and spent significant time at the plant.

48. Boeing had an obvious motive to induce Counterclaimants to purchase the Astech Business and assume the Supply Contract – Boeing did not want GKN to shut down the Astech Business. Indeed, when GKN requested Boeing's consent to the sale and assignment of the Supply Contract, it pitched Boeing specifically on the benefits to Boeing of so doing.

49. For example, in February of 2022, Lori Day reminded Zetterberg, Gionet, and other representatives of Boeing that the previous plan of the Astech Business was a closure; that GKN worked diligently to find a suitable acquirer for Boeing for continuity; and that in the interest of maintaining the facility and business to support Boeing's supply needs, GKN requested consent to the assignment of the Supply Contract. To that same end, Boeing made these false statements

34

and material omissions to induce Counterclaimants to proceed with the purchase of the Astech Business and assumption of the Supply Contract.

50. Boeing had a duty to make a full and fair disclosure in its negotiations with Counterclaimants of GKN's threats to close the Astech Business and Boeing's related plans for any such closure. Boeing controlled that information, which Counterclaimants would be unable to discover through reasonable and customary diligence. Instead, Boeing intentionally concealed its knowledge of GKN's threats, its contingency plans, and its discussions with alternate suppliers from Counterclaimants.

51. In reasonable reliance on these false statements and material omissions by Boeing, Counterclaimants took affirmative steps including, but not limited to:

a. AEP, through a subsidiary, acquired the Astech Business and assumed the Supply Contract;

b. Counterclaimants expended significant resources in due diligence and incurred transaction costs in researching, pursuing, and executing this transaction;

c. In March 2022, Counterclaimants closed on the purchase of the Astech Business and assumption of the Supply Contract;

d. Counterclaimants recruited and provided personnel and other support to the Astech Business, including Richeson, Ed Bidanset as COO, Robert Bradley as Quality Director, Todd Phillips as Maintenance Manager, Max Little as Vice President of Finance, Dan Johnson as Controller, Arman Motamidi as Stress Engineer, Christopher Dunn as Senior Design Engineer, Nick Borelli and Jewel Castelar as Manufacturing Engineers.

e.   Ten Oaks Management undertook management of the Astech Business pursuant to a Management Services Agreement.

52.   Shortly after the closing of the acquisition of the Astech Business, two significant things were revealed.

53.   First, the Astech Business's new management learned that the business was much more troubled than it knew before closing. The reasons for this included, but were not limited to: (a) there was significantly less borrowing capacity from the company's assets than expected; (b) there were fewer efficiencies of scale and other efficiencies than they expected; (c) the labor market for employees with the necessary skills was tight; (d) there was less opportunity for customer acquisition in the short term; and (e) the machinery in the plant was in a general state of disrepair, was highly specialized, and could not be easily repaired or replaced.

54.   Secondly, Counterclaimants learned that Boeing's statements in Paragraphs 47 (a)-(c) above were false: Boeing never intended to provide the Astech Business with any support and Boeing never intended to contribute or underwrite the Astech Business's capital investments in its equipment. Counterclaimants also learned of Boeing's material omissions as set forth in Paragraphs 47 (d)-(g) above.

55.   In fact, upon learning of the financial circumstances and dynamics of the Astech Business, and after pursuing efforts to turn around the Astech Business, Richeson and Lovrovich met with Boeing to ensure Boeing would live up to its promises.  Specifically, they asked Boeing to make reasonable modifications to the Supply Contract and/or provide other financial support. Despite its previous promises to Counterclaimants, Boeing refused and forced the Astech Business into bankruptcy.  Boeing, despite previous promises of support, actively undercut the Astech

business, including direct efforts to harm the Astech Businesses' ability to maintain its leased facility in Santa Ana and otherwise forcing the Astech Business into bankruptcy.

56. Despite its previous promises to Counterclaimants, Boeing refused to make any material accommodations to the Astech Business or otherwise assist with its dire financial situation. This left the Astech Business with no choice but to file for bankruptcy, which it did on July 15, 2022.

57. Boeing hoodwinked Counterclaimants into purchasing the assets of the failing Astech Business by concealing from Counterclaimants the distressed nature of the Astech Business with Boeing and by promising financial assistance that it had no intention of actually providing. Counterclaimants purchased the Astech Business and assumed the Supply Contract in reliance on Boeing's assurances. Yet, Boeing's statements were false at the time they were made, as Boeing had no intention of providing support, and indeed denied that support after closing the transaction, forcing the Astech Business into bankruptcy.

58. Boeing's fraudulent conduct continued through 2022 and into 2023.

59. Rather than engaging in the discussions it promised to have in the February 10, 2022 meeting, Boeing and its representatives, including Michael Omiya and Ed Neveril, willfully interfered in Astech's relationship with its landlord to prevent Astech from securing a future lease for its manufacturing facility ("Facility").

60. Specifically, in or around October 2022, Boeing sent representatives to the Facility, under false pretenses and with express instructions to obscure their identities and their association with Boeing, in order to inspect and surreptitiously lease the Facility out from under Astech.

61. Boeing's scheme succeeded, as it entered into a lease with Astech's landlord on November 9, 2022, while Astech was still in possession of the Facility.

62.    In so doing, Boeing prevented Astech from regaining its financial footing and torpedoed the value of AEP's investment.

63.    Boeing undertook this surreptitious scheme to undermine Astech, with the specific intent of harming Astech, AEP, and Ten Oaks Management and gaining leverage in the ongoing dispute.

64.    To ensure Astech, AEP, and Ten Oaks Management's efforts to turn Astech around would fail, Boeing also refused to respond to Astech's attempts to reestablish production on reasonable terms.

65.    As a result of Boeing's misrepresentations and intentional concealments, Counterclaimants pursued the transaction, ultimately suffering significant damages, including, but not limited to, costs associated with due diligence, transaction costs, personnel costs, non-payment of management fees, investment losses, and attorneys' fees at the hands of Boeing's manipulations.

### COUNT I: FRAUDULENT MISREPRESENTATIONS
### Against Boeing, Zetterberg, Gionet and Armstrong

66.    Counterclaimants reallege each and every allegation contained in paragraphs 1 – 65 above as if fully set forth herein.

67.    As described above, Boeing, Zetterberg, Gionet and Armstrong ("Counter-defendants") each made numerous false representations and material omissions of past and existing facts to Counterclaimants.

68.    These representations were false, and Counter-defendants knew them to be false at the time they were made.  Counter-defendants' failure to take any of the promised actions was intentional.

69.    These representations were also made with reckless disregard for their truth or falsity.

70. Counter-defendants intended that Counterclaimants would rely on their false statements and omissions.

71. Counterclaimants reasonably relied on Counter-defendants' false statements and omissions.

72. Counterclaimants are entitled to recovery of punitive damages under N.C. Gen. Stat. § 1D-1, *et seq.* as Counter-defendants participated in and/or condoned the conduct constituting the aggravating factors giving rise to punitive damages. Counter-defendants are liable for compensatory damages and their actions constitute fraud, malice, and/or willful or wanton conduct, and thus, satisfy the aggravating factors granting an award of punitive damages.

73. Counterclaimants have been injured by Counter-defendants' fraud, including their false and misleading statements and by their material omissions. Counterclaimants expended substantial time and resources to purchase the Astech Business and to assume the Boeing Supply Contract. That investment proved disastrous. As a result of Counter-defendants' fraudulent representations and omissions, Counterclaimants have suffered damages, including punitive damages, attorneys' fees, and all other allowable damages in an amount to be proven in greater detail at trial, but in an amount in excess of $75,000.00, as a result of Counter-defendants' fraud.

### COUNT II: NEGLIGENT MISREPRESENTATIONS
### (In the Alternative to Count I)
### Against Boeing, Zetterberg, Gionet and Armstrong

74. Counterclaimants reallege each and every allegation contained in paragraphs 1 – 73 above as if fully set forth herein.

75. Counter-defendants owed Counterclaimants a duty of care in making truthful, accurate, and/or complete representations about Boeing's plans for the Astech Business and its

relationship with GKN because, without limitation, they knew that Counterclaimants would rely on those representations to proceed with the Astech purchase.

76. Counterclaimants' entire purpose in soliciting information and commitments from Counter-defendants about their commitments regarding their willingness to assist in the financial and operational improvements was to evaluate and decide whether to proceed with the transaction.

77. Counter-defendants knew that this was the purpose for Counterclaimants' solicitations and Counterclaimants would rely on the responsive information and commitments that Counter-defendants provided. Accordingly, Counter-defendants' purpose for providing such information and commitments was to induce Counterclaimants' purchase.

78. As described above, Boeing, Zetterberg, Gionet, and Armstrong each made material misrepresentations and material omissions in the course of these discussions. In so doing, Boeing, Zetterberg, Gionet, and Armstrong failed to prepare and convey the information to Counterclaimants with reasonable care.

79. Counterclaimants reasonably and justifiably relied on Counter-defendants' representations when they proceeded with the Astech purchase to their detriment.

80. Counter-defendants' actions proximately caused injury to Counterclaimants and as a result of the Counter-defendants' negligent misrepresentations, Counterclaimants have suffered damages in an amount to be proven in greater detail at trial, but in an amount in excess of $75,000.00, plus treble damages as allowed under N.C. Gen Stat. § 75-16 and attorneys' fees as allowed under N.C. Gen. Stat. § 75-16.1.

## COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES
## IN VIOLATION OF N.C. GEN. STAT. § 75-1.1
### Against Boeing, Zetterberg, Gionet and Armstrong

81. Counterclaimants reallege each and every allegation contained in paragraphs 1 – 80 above as if fully set forth herein.

82. Counter-defendants engaged in unfair and deceptive trade practices by developing and executing a plan to fraudulently induce Counterclaimants into purchasing the failing Astech Business, and, in furtherance of that plan, making a series of material misrepresentations and material omissions calculated to deceive Counterclaimants as set forth in greater detail above.

83. Counter-defendants' deceptive actions were in and affecting commerce by, without limitation, inducing Counterclaimants to purchase the Astech Business and assume the Supply Contract, which required the Astech Business to produce component parts for use in interstate manufacturing projects conducted by multinational corporations.

84. Counter-defendants' actions proximately caused injury to Counterclaimants. Counterclaimants reasonably and justifiably relied on Counter-defendants' representations when they purchased the Astech Business from GKN, and Counter-defendants knew and intended that Counterclaimants would rely on their representations in deciding whether to purchase the Astech Business.

85. Counter-defendants' actions proximately caused injury to Counterclaimants and as a result of the Counter-defendants' unfair and deceptive conduct, Counterclaimants have been injured. Counterclaimants have suffered damages in an amount to be proven in greater detail at trial, but in an amount in excess of $75,000.00.

41

# PRAYER FOR RELIEF

WHEREFORE, Counterclaimants Ten Oaks Management, LLC and David Richeson and Third-Party Plaintiff AEP Legacy Holdings, LLC, respectfully request that this Court award the following relief:

a. All damages arising out of and related to Counts I, II, and III above, including compensatory and punitive damages, as allowed by N.C. Gen. Stat. § 1D-1, *et seq*. or other applicable laws or statute, in an amount to be proven at trial, plus recovery of all attorneys' fees;

b. Treble damages pursuant to N.C. Gen. Stat. § 75-16;

c. Pre- and post-judgment interest, to the extent allowable;

d. All fees, costs, and expenses, including reasonable attorneys' fees related to this action pursuant to N.C. Gen. Stat. § 75-16.1 or other applicable laws or statute; and,

e. Such other and further relief as the Court deems just and proper.

This the 16th day of February 2024.

**JOHNSTON, ALLISON & HORD, P.A.**

*s/ Michael J. Hoefling*
Patrick E. Kelly, NC State Bar No. 16703
pkelly@jahlaw.com
Michael J. Hoefling, NC State Bar No. 38246
mhoefling@jahlaw.com
J. Nathanial Pierce, NC State Bar No. 52344
npierce@jahlaw.com
1065 E. Morehead Street
Charlotte, NC 28204
Telephone No.: (704) 332-1181
Facsimile No.: (704) 376-1628
*Attorneys for Defendants, Counterclaimants, and Third-Party Plaintiff*

**FORDE & O'MEARA LLP**

*s/ Michael K. Forde*
Michael K. Forde (*pro hac vice*)
mforde@fordellp.com
Brian P. O'Meara (*pro hac vice*)
bomeara@fordellp.com
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone No.: (312) 641-1441
*Attorneys for Defendants, Counterclaimants, and Third-Party Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certified that the foregoing **ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND THIRD-PARTY COMPLAINT** was electronically filed with the Clerk of Court using the CM/ECF system which will send notifications of such filing to the following parties/persons that are registered for service electronically:

| | |
|---|---|
| Joseph A. Mahoney<br>Mayer Brown LLP<br>214 North Tryon St., Suite 3800<br>Charlotte, NC 28202<br>jamahoney@mayerbrown.com | J. Gregory Deis<br>Andrew Spadafora<br>Mayer Brown, LLP<br>71 South Wacker Dr.<br>Chicago, IL 60606<br>gdeis@mayerbrown.com<br>aspadafora@mayerbrown.com |

Glenn K. Vanzura
Mayer Brown, LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
gvanzura@mayerbrown.com

This the 16th day of February 2024.

| | |
|---|---|
| **JOHNSTON, ALLISON & HORD, P.A.** | **FORDE & O'MEARA LLP** |
| | |
| *s/ Michael J. Hoefling*_____ | *s/ Michael K. Forde*_____ |
| Patrick E. Kelly, NC State Bar No. 16703 | Michael K. Forde (*pro hac vice*) |
| pkelly@jahlaw.com | mforde@fordellp.com |
| Michael J. Hoefling, NC State Bar No. 38246 | Brian P. O'Meara (*pro hac vice*) |
| mhoefling@jahlaw.com | bomeara@fordellp.com |
| J. Nathanial Pierce, NC State Bar No. 52344 | 191 North Wacker Drive, 31st Floor |
| npierce@jahlaw.com | Chicago, IL 60606 |
| 1065 E. Morehead Street | Telephone No.: (312) 641-1441 |
| Charlotte, NC 28204 | *Attorneys for Defendants, Counterclaimants,* |
| Telephone No.: (704) 332-1181 | *and Third-Party Plaintiff* |
| Facsimile No.: (704) 376-1628 | |
| *Attorneys for Defendants, Counterclaimants,* | |
| *and Third-Party Plaintiff* | |